KEYES et al.

v.

CARRICK et al.

Court of Appeals of Kentucky.

March 26, 1954.

Rehearing Denied June 18, 1954.

Troy D. Savage, William H. Smith and Stoll, Keenon & Park, Lexington, for appellants.

McDonald & McDonald and Henry T. Duncan, Lexington, for appellees.

DUNCAN, Justice.

This declaratory judgment action involves the construction of two contracts by which the appellees, J. C. Carrick and his wife, Anna Pearce Carrick, leased two separate storerooms in their building on Main and Limestone Streets in Lexington. The judgment declares invalid an assignment of one of the leases and requires the appellant, Edward Kessler, to surrender possession of the premises occupied by him.

The building in question is divided into five separate storerooms, each of which is occupied as a unit by a different lessee. The two rooms involved in this action are designated throughout the record as No. 101 and No. 105.

On October 24, 1944, room No. 105 was leased to Robert Zeff, David Zeff, and Nathan Zeff for the purpose of conducting a retail jewelry store. The original term of the lease was five years, but it has been extended from time to time and the current extension expires on June 1, 1959. The Zeffs subsequently assigned their lease to appellee, Roberts Jewelry Company, which is the present occupant of storeroom No. 105. This lease contained the following provision which remained unchanged by the subsequent extensions:

"Lessors will not rent to any person, firm or corporation premises in the same building in which the leased premises herein are located during the period of this lease for any purpose inimical to the purpose herein granted lessees."

On May 6, 1949, the Carricks leased storeroom No. 101 to Freeman Keyes and W. B. Owens for a period of five years with an option to renew for an additional ten years. Owens, who is no longer in the picture, subsequently assigned his interest to Keyes. This lease contained the following provision concerning the use of the premises:

"Said premises are rented the lessees to conduct a mercantile business, and for the sale of nuts, and similar merchandise, and such sundry merchandise as is or may be dealt in by lessees in the demised premises. The lessees, however, shall not be permitted to conduct a restaurant in said building."

There is the further provision concerning the right to sublease or assign the lease:

"The lessees may sublease the premises or any part thereof, at any time during the term of this lease, or may assign this lease for a whole or a part of the term, provided, however, that the subtenant or assignee shall be required to abide by any and all of the terms of this lease, and shall be subject to the approval of the lessors in advance, * * *."

These lessees took possession of the premises and began operation of a retail nut shop under the trade name of "Renfro Valley Nut House." This business proved unprofitable and in the spring of 1951, the lessees became anxious to find a purchaser to whom they could assign their lease or sublet the premises. Two prospective purchasers were contacted, but the Carricks refused to consent to an assignment or sublease because the proposed purchasers each contemplated the operation of a jewelry store. The disapproval was indicated in each instance by a letter from J. C. Carrick to Mr. Keyes.

Sometime in August 1951, appellant Kessler contacted Mr. Keyes, who lived in Chicago, concerning his desire to purchase the lease on storeroom No. 101 for the purpose of operating a retail jewelry store. Kessler had previously been employed by the Zeffs but learned that they were selling

their store. He was informed that approval from the Carricks was necessary before an assignment of the lease could be made.

On or about August 20, 1951, Mr. Kessler went to the office of Mr. Carrick and told him of his tentative desire to acquire the Keyes lease for the operation of a jewelry store. He informed Mr. Carrick that he did not wish to compete with the Zeffs but was interested in the lease in the event they sold their store. Mr. Carrick orally approved of him as a prospective tenant and offered no objection to the business which he proposed to operate. On August 23, 1951, Mr. Carrick wrote a letter to Mr. Keyes, stating that Mr. Kessler had been in his office and that "he impressed me as being a very nice person. I have known him for some time—as he was in one of my stores at one time. I think he is thoroughly reliable." In the same letter, he advised Mr. Keyes as to the value of his lease, stating, "I also heard that you were offered $9,000 for this lease—but I feel that the lease is worth more than that amount."

A few days later, Kessler made a second trip to Mr. Carrick's office to confer with him concerning the availability of the store space and his qualifications as a tenant. Again, no disapproval was indicated, and the parties examined the Zeff lease and the effect of the word "inimical" as it appeared therein was discussed. Mr. Carrick stated at that time that he did not think he would have any trouble concerning this provision.

Some time later, Kessler learned that the Zeffs had concluded a sale of their store to appellee, Roberts Jewelry Company. He then went to the office of Mr. Carrick on September 20, 1951, and informed him that he was ready to acquire the Keyes lease if the proposed transfer met the lessors' approval. Mr. Carrick then dictated and signed a letter which was delivered to Mr. Kessler. In view of the fact that the construction of this letter is one of the principal issues in the case, we quote it in full:

"Re: Mr. Edward Kessler
415 Queensway Drive
Lexington, Kentucky

"To Whom It May Concern:

"I am glad to be able to recommend Mr. Edward Kessler as being a thoroughly competent and reliable business man of excellent character. He, being an applicant to become a future tenant in my store located at the corner of Main & Limestone Streets, and known as the Renfro Valley 'Nut Hut'—and to be conducted as a jewelry store.

- "Mr. Kessler was formerly associated with 'Zeff Brothers'—and at the present time is operating two stores in other localities. I wish to state that in my opinion he would be a most desirable tenant.
                "Sincerely,
                /s/ J. C. Carrick"

On the same day the letter was written, Kessler called Keyes and read it to him. Relying upon the letter as constituting approval for the transfer, Keyes assigned the lease to Kessler for $3,000. Immediately afterwards, Kessler began arrangements to open a jewelry store by ordering his merchandise and fixtures and contracting for some improvement of the storeroom. The store was finally opened for business on November 3, 1951.

Under date of September 26, 1951, a firm of lawyers in Akron, Ohio, who represented Roberts Jewelry Company, addressed a letter to Mr. and Mrs. Carrick, stating that they had learned of the assignment and of the assignee's plan to operate a jewelry store. Demand was made that the Carricks take steps to prevent the operation of a competing business or answer in damages for their violation of the Zeff lease. A letter on behalf of Mr. Carrick and a telegram from Mrs. Carrick was then sent to Mr. Keyes informing him that the transfer to Kessler did not have approval of the lessors. About the time this letter was received, Mr. Carrick, who is eighty-three or eighty-four years

of age, was taken to a hospital for a serious operation. On account of his physical condition, with possibly some mental involvement, he was unable to testify or actively participate in the events preceding this litigation.

On October 17, 1951, the Carricks filed this declaratory judgment action against Keyes, Kessler, and Roberts Jewelry Company. The issues were completed by appropriate pleadings which finally presented the following questions: (a) Was there a covenant in the Zeff lease against letting any other portion of the premises for a business competitive to the jewelry business? (b) If there was such a covenant, was it violated by the Carricks? (c) Should Keyes have obtained the prior approval of the Carricks to the Kessler assignment, and if so, did the letter of September 20 constitute such approval? and (d) Under the circumstances, does Kessler have the legal right to operate a jewelry store on the premises? The lower court declared only that the approval of the Carricks was necessary before a valid transfer of the lease could be made and that such approval had not been obtained. Based upon this finding, Kessler was ordered to vacate the premises. Judgment was reserved on the other questions since the conclusions of the lower court made it unnecessary to consider them. We consider first the questions specifically answered by the court.

There is no controversy concerning the finding that Keyes could not make a valid assignment or sublease without first obtaining approval from the Carricks. The real question is whether or not such approval was obtained as evidenced by the September 20 letter. Appellants insist that the letter amounted to an unqualified approval of the sublease, while counsel for the Carricks insist that it was nothing more than a recommendation of Kessler.

■ We do not attach much significance to the fact that the letter was addressed "To Whom It May Concern." It specifically states that Kessler is an applicant to become a tenant in a storeroom which is identified as the one occupied by Keyes and it clearly indicates that the premises are to be operated as a jewelry store. It is not denied that the letter was the culmination of a series of conferences in which the question of the approval of a sublease or assignment to Kessler was directly considered and discussed. It is suggested that the letter may have been written as a general recommendation of Mr. Kessler for use at some time in the future or with some other prospective landlord. To accept such an explanation would completely ignore the testimony of Kessler and base our construction upon an hypothesis which is not even suggested by the testimony. The conclusion seems inescapable that the letter, considered in the light of surrounding circumstances, amounted to an approval of an assignment or sublease to Kessler.

■ It is also insisted that no approval was obtained from Mrs. Carrick, who was the owner of a three-fourths undivided interest in the building. It is shown that for several years Mr. Carrick had looked after the leasing of the various storerooms in this building, negotiated with the tenants and prospective tenants, and collected the rentals. Under these circumstances, we think an agency is clearly implied and that Mrs. Carrick is bound by Mr. Carrick's approval.

■ The pleadings also raise an issue as to Mr. Carrick's mental capacity to approve the sublease or assignment on September 20. The evidence shows that he had suffered with prostate trouble for some time and occasionally evidenced some mental confusion. However, he had been looking after his extensive business affairs and attending directors' meetings of a bank of which he was an officer. The evidence is not sufficient to show, and it is not seriously contended, that he was incompetent at the time he wrote the letter of September 20.

Since there was an approval of Kessler as sublessee or assignee of the Keyes lease, it follows that the judgment was erroneous in requiring Kessler to surrender posses-

sion of the leased premises. This conclusion makes it necessary to consider the questions relating to the lease from the Carricks to the Zeffs.

The appellants and the Carricks insist that the Zeff lease does not prohibit the lessors from leasing other portions of the building for a business competitive with the jewelry business. The Roberts Jewelry Company contends that the lease, fairly construed, does contain such a prohibition. The question largely turns on our construction of the word "inimical."

■ It is an elementary rule of construction that a covenant or agreement by a lessor not to lease the retained property for the purpose of conducting a business in competition with the lessee must be positively expressed and, being in restraint of trade, must be strictly construed. The words relied upon as creating such a covenant should not be extended beyond their literal meaning, and if two constructions are possible, the one which does not limit the use of the property should be adopted. 51 C.J.S., Landlord and Tenant, § 238, p. 865.

The word "inimical" is not found in legal dictionaries and is not ordinarily used in legal parlance. It is defined by Webster as "unfriendly, hostile, having the disposition of an enemy, antagonistic." Competition is not necessarily unfriendly, hostile, or antagonistic. In fact, it is generally regarded as a healthy component of our economy to be fostered rather than restrained. Such an "inimical" type of business as was contemplated by the lease might be a saloon or shooting gallery which would constitute a nuisance or unfriendly atmosphere in which to do business.

It would have been easy to insert in the lease a covenant whereby the lessor agreed not to lease any other portion of the premises for a jewelry store, or for a business competitive to that of the lessee. Certainly the word "inimical" does not clearly mean or include "competitive," and applying the strict construction rule must be construed as not preventing a competitive business.

■ It is insisted that Dr. Carrick indicated in his letter to Keyes, refusing approval of sales to others interested in acquiring the premises for a jewelry store, that he at that time thought the clause was restrictive as to a competing business. In writing these letters, Dr. Carrick was not dealing or communicating with the Zeffs or their successors, and Roberts Jewelry Company cannot avail itself of any communication he had with third parties concerning his interpretation of the word. It might as reasonably be argued that Carrick did not so construe the word when he leased to Keyes because that lease did not restrict Keyes from engaging in any business except the operation of a restaurant. It can well be assumed that Dr. Carrick did not himself know the meaning and effect of the clause and, out of an abundance of precaution, chose to be on the safe side in dealing with the original efforts of Keyes to sublease the premises. Such caution on his part would not have the effect of changing the interpretation of a contract with other parties. Whether or not he was under a moral or legal obligation to protect Roberts against competition, a desire to do so was a sufficient reason for him to withhold consent to an assignment or sublease which would permit or promote such competition.

■ An application of the doctrine of contemporaneous construction is dependent on acts, conduct, or declarations of the parties, indicating a mutual intent and understanding. While the construction placed on the contract by one party may be evidence of his own construction, the meaning of the contract cannot be established by the construction of one of the parties, unless such interpretation has been made to and relied on by the other party. 17 C.J.S., Contracts, § 298, p. 714.

■ We do not think the Zeff lease can be construed as prohibiting the lessor from letting any other portion of the premises for a business competitive to the

jewelry business. It follows that there was no violation of the terms of that lease by the subsequent lease to Keyes or the approval of the assignment of the latter lease.

The judgment is reversed for the entry of one in conformity with this opinion.

STEWART, CAMMACK, and MILLI-KEN, JJ., dissent from the portion of this opinion construing the word "inimical" as not including a competitive business.