**EMPLOYEES CONSUMER ORGANIZA-TION, INC., a Corpora-tion, Appellant,**

v.

**GORMAN'S INC., a Kansas Corporation, Commerce Trust Co., a Missouri Banking Corporation, George P. Krieder, Mary H. Krieder, Salome K. Thomas, Charlotte P. Vroom, Susan B. Bartholf and Elizabeth P. Garvey, All of Sangamon County, Ill., and Springfield Marine Bank, an Illinois Corpo-ration, Robert J. Saner, Trustee, of Sanga-mon County, Pennsylvania, Respondents.**

No. 51111.

Supreme Court of Missouri,

Division No. 1.

Nov. 8, 1965.

Keith Wilson, Jr., Independence, for appellant.

Sheffrey, Ryder & Skeer, David Skeer, Judith Whittaker, Kansas City, for respondents, Commerce Trust Co., George P. Krieder, Mary H. Krieder, Salome K. Thomas, Charlotte P. Vroom, Susan B. Bartholf, Elizabeth P. Garvey, Springfield Marine Bank and Robert J. Saner.

HENLEY, Judge.

This is a suit for specific performance of the provisions of a lease contract to re-build or, in the alternative, for damages of $1,545,165.74, for failure of defendants to rebuild after its destruction by fire a build-ing occupied by plaintiffs. Judgment was for defendants and plaintiff appeals. This court has jurisdiction, the amount in dispute exceeding $15,000. Article V, § 3, Constitution of Missouri, V.A.M.S.; Sec-tion 477.040, RSMo 1959, V.A.M.S.

For convenience and clarity the parties will be referred to hereinafter as follows: plaintiff-appellant, Employees Consumer Organization, Inc., a corporation, as ECO; defendant-respondent, Gorman's, Inc., a corporation, as Gorman's; the remaining defendants-respondents as Trustees.

By an instrument executed July 21, 1958, Gorman's, as the lease-tenant of Trustees, sublet to ECO the building or premises owned by Trustees known as 1214–16–18 Grand Avenue in Kansas City, Missouri. On July 4, 1960, an explosion and fire destroyed the building. It was not rebuilt, a parking lot having been constructed thereon. This suit was filed August 13, 1962.

ECO contends that the relationship created between the parties by the above-mentioned and other instruments is not the usual, ordinary landlord-tenant-subtenant relationship; that this is not a suit by a subtenant "to enforce the landlord's covenants contained in the basic lease, where there are no rights accruing to the subtenant and there is neither privity of contract nor estate between the parties"[1]; that by the instruments described below there was established between Trustees and ECO the direct relationship of landlord and tenant; and, that by reason thereof ECO is entitled to enforce a covenant to rebuild contained in the basic lease from Trustees to Gorman's.

The Trustees, by an instrument in writing dated February 5, 1954, leased the premises to Gorman's for a term of 15 years expiring August 31, 1969, for a rental of $30,-000 per year (payable $2,500 per month in advance on the first day of each month) plus a percentage of the annual sales in excess of a certain amount. Article VI of the lease permitted the lessee to assign the lease or sublet the premises, but upon such assignment or subletting lessee was not relieved of liability for rent or other provisions of the lease. Article X provided that in the event that the premises were damaged or destroyed by fire, it would have certain effects upon the lease. By Article XI the lessor covenanted to keep the buildings insured against loss for not less than the replacement cost. For the purposes of this opinion we assume, without deciding, that Articles X and XI required the lessor to rebuild the building forthwith, so we will not set out verbatim the provisions of these articles.

Three days later, on February 8, Trustees and Gorman's executed an addendum to the above lease changing Article VI to provide that lessee could assign the lease or sublet the premises to certain types of businesses and companies or corporations (of which ECO was not one, so far as this record shows), but could not otherwise assign or sublet without the written permission of lessor although it might license others to operate departments of the business and sell merchandise as such on the premises. The lease and addendum will be referred to hereinafter as the basic lease.

Gorman's vacated the premises in October, 1957, and the vacancy continued until the premises were occupied by ECO in May or June, 1958.

On or about July 21, 1958, Trustees, Gorman's and ECO entered into an agreement effective May 1, 1958, entitled "Consent to Sublease and Modification of Lease", wherein Trustees consented to a subletting of the premises by Gorman's to ECO. This agreement further provided: (1) that Gorman's would remain liable for payment of the rent and for the performance of other covenants for which it was obligated in the basic lease; (2) that so long as ECO occupied the premises and operated in the manner provided in the sublease, the Trus-

---

1. The general rule, quoted in ECO's brief, being: "There is privity neither of contract nor of estate between the lessor and a sublessee unless the sublessee attorns to the original lessor, since a lease from the lessor to the lessee does not pass to a subtenant, as it does between the landlord and an assignee of the lease. * * *" 51 C.J.S. Landlord and Tenant § 48, p. 580.

tees would waive the provisions of the basic lease providing for a percentage rental to be paid by Gorman's, and agreed that the total annual rental would be $30,000 while Gorman's waived its right to reimbursement from Trustees for certain money advanced by Gorman's for prior alterations and improvements to the premises; (3) that for any default for which Trustees might terminate the basic lease according to its terms, Trustees would give ECO 30 days' written notice thereof and would not terminate the basic lease if ECO within such 30 days remedied such default, or caused it to be remedied; (4) that ECO would furnish a non-cancellable surety bond naming Trustees and Gorman's as obligees guaranteeing the payment of the maximum sum of $30,000 in the event ECO defaulted in payment of the rent provided for in the sublease; and, (5) that the terms and provisions of the basic lease remained in full force and effect, except such of those that might conflict with the consent to sublet or the sublease, in which event the latter instruments should prevail.

On the same day, July 21, Gorman's, warranting that the basic lease was in full force and effect and that it had the right to sublet subject to the written consent of Trustees, sublet the premises to ECO for a term of 10 years ending April 30, 1968, for a rental of $300,000, payable $2,500 per month on the first day of each month. This sublease further provided: (1) that ECO had paid $5,000 to Gorman's as rent for May and June, 1958; (2) that subsequent rent be paid by check payable to Springfield Marine Bank of Springfield, Illinois, one of the Trustees; (3) that ECO would furnish a non-cancellable surety bond naming Gorman's and Trustees as obligees guaranteeing the payment of the maximum sum of $30,000 in the event ECO defaulted in the payment of the rent provided for therein; that $30,000 was the maximum amount of ECO's liability for failure to pay rent or for its breach of any other covenant of the sublease or basic lease; (4) that ECO might, at its option, cancel the sub-

lease at the end of its fifth year, upon six months' written notice thereof to Gorman's; (5) that ECO would not assign the demised term or sublet the premises (except in certain instances not pertinent here) without the written permission of Gorman's and Trustees; (6) that Gorman's would not be liable for any default of Trustees under the basic lease; and, (7) that the sublease would terminate upon written notice by Gorman's if any violation of its terms by ECO continued for 30 days.

It might be noted at this point that the sublease term would expire April 30, 1968, sixteen months before expiration of the term of the basic lease on August 31, 1969, and that ECO had the option to terminate the sublease at the end of the fifth year of its term.

On the same day, July 21, the Trustees and Gorman's executed a second addendum to the basic lease wherein they reaffirmed the basic lease, and Trustees agreed to the subletting by Gorman's to ECO subject to essentially the same conditions as those in the consent to lease. The only substantial difference between the terms and provisions of the consent to lease and this addendum is that in the latter, Trustees and Gorman's consented to the alteration of the building front by ECO according to plans attached thereto, and Gorman's and ECO agreed to restore the front to its original condition at the termination of the basic lease and not make further alterations without permission of Trustees. Appended to this addendum, below the signatures of Trustees and Gorman's, was the following executed by ECO: "In consideration of the consent of the Trustees to this sub-leasing, and the sub-leasing by Gorman's, ECO agrees to be subject to and bound by the provisions of the Basic Lease and this Second Addendum."

The surety bond executed by ECO and certain individuals as principals, and The Summit Fidelity and Surety Company as surety, as obligors, was delivered to Trustees and Gorman's, as obligees. It is not

necessary to set out the provisions of the bond, its obligation being essentially that described above.

Edward Jaben, president of ECO, testified that he and others of ECO began negotiations with Gorman's for the occupancy of these premises in January or February, 1958; that the negotiations were with Sam Gorman and the latter's attorney, a Mr. Jules Kahn, and that at one or two of these meetings he saw a Mr. Harvey Schmelzer, an agent of the Trustees; that all rent due under the sublease has been paid; that on August 2, 1960, he visited Harvey Schmelzer, agent for the Trustees, to inquire what plans the Trustees had for rebuilding the building, and was told that the Trustees "hadn't considered it yet", that he would hear from them "or that I should contact Mr. Tucker [attorney for Gorman's] in the future * * *"; that he heard no more from Schmelzer or anyone else representing the Trustees regarding rebuilding; that after the fire ECO secured a public liability policy on that portion of the building remaining covering ECO, Gorman's and Trustees; that he first became aware that the building would not be rebuilt when he saw a parking lot being built at this location; that he met with Sam Gorman after the fire and told Gorman that ECO wanted the building rebuilt; that Gorman said this was not his problem but was that of the owners; that on August 31, 1960, ECO's attorney wrote to Mr. Tucker, attorney for Gorman's, insisting that the building be rebuilt in accordance with the terms of the lease or that ECO be compensated for damages incurred by reason of failure to rebuild; that neither he nor his attorney had ever written the Trustees or their agent requesting that the building be rebuilt.

Sam Gorman, president of Gorman's, testified that the premises were vacated by Gorman's in October, 1957, and continued vacant until Gorman's sublet to ECO, who took possession in May or June, 1958; that it was after the negotiations between Gorman's and ECO had culminated in a meeting of minds on the sublease that he first contacted the Trustees to get their approval; that after the fire he had a meeting with Mr. Schmelzer, agent for the Trustees, and some of the Trustees, and told them that so far as Gorman's was concerned it did not care to have the building rebuilt; that Gorman's did not, to his knowledge, receive a letter from ECO requesting that the building be rebuilt unless it be the letter from ECO's attorney, dated August 31, 1960, addressed to Gorman's attorney; that he and Jaben discussed rebuilding, but that he (Gorman) did not think it practical.

There was evidence also as to the amount of damage suffered by ECO as a result of the failure to rebuild, and there is a contention that ECO defaulted in the payment of certain rent claimed to be due. However, considering the view we take of the issues, it is not necessary to recite the evidence on these matters or discuss the contention.

■■■ Whether the instrument of transfer from Gorman's to ECO is a sublease or an assignment of the basic lease is the pivotal issue in this case. It is one or the other, and one creates relationships between the parties different from the other. " * * * Primarily, the test is whether, by the transaction, the lessee conveys his entire term or retains a reversionary interest, however small. As a general proposition, if by the transaction the lessee conveys the entire term and thereby parts with all reversionary interest in the property, the transaction is construed to be an assignment; but if there remains a reversionary interest in the estate conveyed, it is a sublease. * * * Clearly as regards the original lessor, the criterion for determining whether a transaction in the form of a lease constitutes an assignment or a sublease is whether the entire interest in the term is transferred, without a reversion being retained by the original lessee. * * *" 32 Am.Jur., Landlord and Tenant, page 290, § 314, St. Joseph & St. L. R. Co. v. St. Louis, I. M. & S. Ry. Co., 135 Mo. 173, 36 S.W. 602, 605 [2], 33 L.R.A.

607; 51 C.J.S. Landlord and Tenant § 37, page 553, et seq. As to the rights of an assignee or sublessee against the original lessor, the assignee of a lease succeeds to all the interest of the lessee and to the benefit of all the covenants and agreements of the lessor which are annexed to and run with the leasehold estate, whereas the sublessee does not acquire any right to enforce the covenants or agreements of the lessor contained in the original lease. The sublessee's rights depend on the covenants or agreements in his sublease. First Trust Co. v. Downs, Mo.App., 230 S.W.2d 770, 774 [1–4]; Weigle v. Rogers, 202 Mo.App. 520, 213 S.W. 501.

The negotiations between Gorman's and ECO were for a sublease, not an assignment of the basic lease; they recognized in their negotiations the necessity of consent by Trustees to a sublease; the Trustee's consent was to a sublease, not to an assignment; the instrument of conveyance from Gorman's to ECO was described as a sublease, and the consent to lease and second addendum referred to and were predicated upon a sublease; plaintiff's petition and the evidence referred to the instrument as a sublease. The instrument is in form a sublease, but no matter the form, its term was limited in point of time to less than that of the lease from Trustees to Gorman's; Gorman's remained liable to Trustees for payment of rent and the performance of other covenants of the original lease, and reserved the right to reenter for breach of any of the covenants of the sublease.

We find, and hold, that the instrument of conveyance from Gorman's to ECO is unquestionably a sublease, and that its effect as such is not changed or affected by the other instruments contemporaneously executed by the parties; that ECO is not entitled to the benefit of the provisions or covenants of Articles X and XI of the original lease, the same not having been assigned to it; that ECO's rights claimed in this suit are governed solely by the sublease, and it contains no covenant to rebuild. The payment of rent by ECO direct to Trustees did not constitute an attornment to the latter and did not change the relationship between these two to that of tenant and landlord. First Trust Co. v. Downs, supra, 230 S.W.2d l. c. 776 [12]; Leibowitz v. Bickford's Lunch System, 241 N.Y. 489, 150 N.E. 525.

This disposes of the basic issue in the case and makes it unnecessary to discuss or consider other points briefed by appellant and respondents.

The judgment is affirmed.

All concur.