**HOLIDAY VILLAGE SHOPPING CENTER, a Corporation, and Appalachian Insurance Company, a Corporation,** Plaintiffs,

v.

**OSCO DRUG, INC., a Corporation,** Defendant.

No. 2823.

United States District Court,
D. Montana,
Great Falls Division.

Aug. 19, 1970.

Robins, Davis & Lyons, St. Paul, Minn., Swanberg, Koby & Swanberg, Great Falls, Mont., for plaintiffs.

Jardine, Stephenson, Blewett & Weaver, Smith, Emmons & Baillie, Great Falls, Mont., for defendant.

OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

Plaintiffs, Holiday Village Shopping Center, (hereafter Holiday Village) and Appalachian Insurance Company, (hereafter Appalachian) sue defendant, Osco Drug, Inc., (hereafter Osco) for negligently starting a fire. Osco's motion for summary judgment presents the

question of whether Osco, even if negligent, was protected by reason of the exculpatory language of the lease covering a portion of the burned premises. The facts are:

1. The terms of the lease which were material to the dispute here are:

(The paragraphs in this footnote are given arbitrary numbers for the sake of convenience.)

(1) "TO HAVE AND TO HOLD the leased premises together with all appurtenances, for a term of Twenty (20) years commencing on the date Lessee commences to do business with the public in the leased premises or on the sixtieth (60th) day following the acceptance of possession of the leased premises, whichever day is earlier."

\*     \*     \*     \*     \*

(2) "Lessee may enter upon the leased premises during the course of construction to inspect the construction work and to install its fixtures, equipment, and inventory, and such entry shall not constitute acceptance of possession of the leased premises by Lessee."

\*     \*     \*     \*     \*

(3) "The term of this Lease shall not commence nor shall any rent become due or be payable until Lessee commences to do business with the public in the leased premises, or on the sixtieth (60th) day following the acceptance of possession of the leased premises, whichever day is earlier. Lessee shall accept possession of the leased premises when they are ready for occupancy, the words 'ready for occupancy' being defined for this purpose to mean the date upon which the construction work referred to in paragraph 5, is fully completed in accordance with the plans and specifications and exclusive possession of the leased premises is delivered to Lessee. If Lessee accepts possession of the leased premises on a date other than the date they are ready for occupancy as specified herein the term shall commence on the sixtieth (60th) day following the date Lessee accepts possession, or commences to do business with the public in the leased premises, whichever is earlier and continue for a period of twenty (20) years."

\*     \*     \*     \*     \*

(4) "Since the rental is intended to cover the cost of insuring the premises against loss by fire and other casualties considered by the parties to be hazards incident to ownership and against which owners ordinarily carry insurance, Lessor agrees to carry insurance in such amount as to protect it fully against loss or damage to the premises resulting from fire, other

Holiday Village constructed a shopping center. During the course of construction of the center Holiday Village leased a portion of it to Buttrey Foods, Inc., (hereafter Buttrey).[1]

peril covered under the standard extended coverage endorsement, or boiler explosion (if the premises include a boiler) and in such form as to contain a waiver of all recourse and subrogation rights by the insurance company against the Lessee and its agents for liability for any such loss or damage however caused. This provision shall not prohibit Lessor from self-insuring or co-insuring all or part of the risk of such loss or damage; the Lessor, however, hereby expressly assumes all risk of loss resulting from such self-insurance, co-insurance or deficiency in the amount of insurance carried, and further releases and forever discharges Lessee, its agents and employees of and from all liability to Lessor and to anyone claiming by, through or under Lessor on account of any such loss or damage to the demised premises, however caused."

\*     \*     \*     \*     \*

(5) "Lessee may from time to time assign or re-assign this Lease or sublease the whole or any part of the leased premises for the purpose of operating a grocery or food business selling merchandise usually sold in grocery or food supermarkets or for any other lawful purpose, provided that the type of business or purpose for which Lessee so assigns or subleases is not prohibited by the terms and provisions of any other lease then in effect between the Lessor and any other tenant of the Shopping Center and provided further that in the event any sublease or assignment shall be made which increases the insurance rate respecting the leased premises Lessee shall upon demand reimburse Lessor for any such increase in insurance cost. In the event of any such assignment or sublease, Lessee shall remain liable for the performance of all of the covenants of this Lease."

\*     \*     \*     \*     \*

(6) \* \* \* "provided, however, that in *no event* shall the Lessee be liable for any loss or damage to the improvements on the Second (2d) Addition to Holiday Village Shopping Center or the leased premises caused by fire, the elements or any cause covered by the extended coverage insurance required to be carried by the Lessor irrespective of any negligence on the part of the Lessee which may have contributed to such damage."

\*     \*     \*     \*     \*

Buttrey and Osco, following the execution of the Holiday Village lease, entered into negotiations for the occupancy by Osco of a portion of the leased space. In anticipation of some kind of a right to occupy such portion of the leased space Osco entered the premises in late September, 1967. The fire occurred on October 16, 1967. A formal sublease was executed by Buttrey and Osco on December 6, 1967. The exact relationship between Buttrey and Osco on October 16, the date of the fire, is somewhat obscure, but the Court finds that Osco was a sub-lessee[2] rather than an assignee, of a portion of the space.

On October 16, 1967, the day of the fire, Buttrey was rightfully in possession of the leased premises, the possession having been delivered by Holiday Village on October 1, 1967. On that day Osco was rightfully in possession under the authority of Buttrey. The "term" of the lease had not commenced in the sense that the rent had started to accrue. Under these circumstances do exculpatory provisions in the lease protect Osco?

Plaintiffs contend that the exculpatory provisions are not effective as to Osco, first because the terms of the lease were not enforceable on the day of the fire and, second because Osco, as a sub-lessee was not protected by the terms of the lease. These problems must be resolved by reading the lease in the light of the general relationships of the parties at the time it was executed.[3]

The lease expressly provides that Holiday Village was to provide for insurance and the lease recites the fact that the rentals would reflect the cost of the fire insurance. (Footnote 1, subparagraph (4)). The parties here were dealing with a building to be constructed. They could not know precisely when the building would be ready because of the uncertainties of the construction schedule. They did know that prior to the time that the contractors were completely out of the building that it could be occupied for some purposes and it was to the advantage of Holiday Village to have Buttrey install fixtures and inventory as soon as possible because the rent was based partly on a percentage of sales, and because one of the events which would start the rent to run was Buttrey's doing business with the public. (Footnote 1, subparagraph (3)). As indicated by the language used in the lease the parties were fully cognizant of the fire insurance problem. Nowhere is there a suggestion that during the period of occupancy prior to the commencement of the term Buttrey should carry fire insurance on the building. On the contrary Holiday Village agreed to get insurance under policies which would waive subrogation rights as to "*any* such loss or damage however caused." Holiday Village released the lessee, its agents and employees from "*all* liability * * * to lessor * * * on account of any such loss * * * to the demised premises, however caused." (Footnote 1, subparagraph (4)). The same general thought that Buttrey should in "*no event*" be liable for the fire loss is expressed in another paragraph in the lease. (Footnote 1, subparagraph (6)). (Emphasis supplied)

It is not likely that parties situated as were the parties here, would except from the general insurance scheme which was to be in effect for at least twenty years, a brief period of occupancy of unknown duration, and if that was the intent of the parties, there is nothing in the language of the lease to reveal it. There is no reason for dividing the occupancy under the lease into the non-rent paying and rent paying periods and arbitrarily holding that the terms of the

(7) "All of the rights and obligations or (of) the parties under this Lease shall bind and inure to the benefit of their respective heirs, personal representatives, successors and assigns."

2. The distinction is pointed out in McNamer Realty Co. v. Sunburst Oil & Gas Company, 76 Mont. 332, 247 P. 166 (1926).

3. R.C.M.1947, § 13–713.

lease apply to one period and not the other. Rather the lease should be construed in its entirety and those provisions of it which would logically be operative during the nonrent period should be made effective.[4] I am of the opinion therefore that the exculpatory provisions of the lease did protect Buttrey during the nonrent period.

■ The question remains did Osco stand in Buttrey's shoes? A sublease creates neither privity of estate or contract as between lessor and the sublessee and vests no right in the sublessee to enforce the lessor's agreements contained in the original lease.[5] I think however that it was the intention of the parties to protect a sublessee and that the language of the lease may be so interpreted.

■ Buttrey was given the right to assign or sublet, in whole or in part, (Footnote 1, subparagraph (5)), and sublessees and assignees were both intended to be embraced in the general insurance scheme. The lease specifically relates the rent to the insurance costs as affected by the operations of the assignees and sublessees. (Footnote 1, subparagraph (5)). For fire insurance purposes there appears to be no reason for treating a sublessee differently from an assignee. In terms of economic realities the technical distinctions between an assignee and a sublessee have no importance, and the important consideration, i. e., the hazard caused by the nature of the sublessee's business, is as noted, provided for in the lease.

There are no words which expressly relate the exculpatory clause to a sublessee. The clause in the lease labeled "Successors" contains the words "heirs, personal representatives, successors and assigns." Authority could most certainly be found to the effect that under many circumstances no one of these words standing alone includes a sublessee. If, however, the effort is made to find the intention of the parties,[6] and if the words are to be taken in an ordinary and popular sense[7] rather than according to their legal meaning, then it does not do violence to the phrase "heirs, personal representatives, successors and assigns" to hold that it was intended to extend the terms of the contract to all persons whose presence in the building would help defray the rent, and thus create funds for the purchase of the insurance.

In the guts of the contract where the draughtsmen were thinking in terms of dollars and cents, the sublessee's status as a part of the general insurance scheme was recognized. When the draughtsmen described the "Right of Successors" they used the legal cliche "heirs, personal representatives, successors and assigns". In a contract between corporate parties the use of the words "heirs and personal representatives" does not indicate any careful maintenance of technical legal distinctions. In a loose sense Osco did succeed to a part of what Buttrey had. In a loose sense and equating the word "assign" with the word "transfer" Buttrey did assign something to Osco. In a loose sense Osco is a successor and assignee and where, as here, the parties have used the words loosely, the Court likewise uses them loosely for the purpose of giving effect to the evident intention of the parties.

An order granting the motion for summary judgment has been entered. This opinion explains it.

---

4. Among such provisions are those requiring the lessee to repair damage caused by its negligence, to replace glass, to hold lessor harmless from damages to third persons caused by lessee's negligence.

5. 49 Am.Jur.2d Landlord and Tenant, § 508.

6. R.C.M.1947, § 13–702.

7. R.C.M.1947, § 13–710.