214 N.J. Super. 227 (1986)
518 A.2d 790
BERKELEY DEVELOPMENT CO., PLAINTIFF,
v.
THE GREAT ATLANTIC & PACIFIC TEA COMPANY AND COMMUNITY DISTRIBUTORS, INC. (INCORRECTLY IMPLEADED AS DRUG FAIR, INC.), DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided September 5, 1986.
*231 Robert J. Fettweis for plaintiff (Clapp & Eisenberg, attorneys).
Christine D. Petruzzeli for defendant The Great Atlantic & Pacific Tea Company (Wilentz, Goldman & Spitzer, attorneys).
Rowand H. Clark for defendant Community Distributors, Inc. (Bernstein, Hoffman & Clark, attorneys).
BOYLE, J.S.C.
The issue in this case is: does a tenant-assignee, a modern chain drug store, selling general merchandise including food, have the right to enforce a covenant against competition contained in an original lease between the landlord, a shopping center owner, and the original tenant-assignor, a supermarket, where the tenant-assignor has ceased its operations within the shopping center?
This court has decided that it does not under the circumstances.
*232 Plaintiff, Berkeley Development Co. (Berkeley), filed a complaint for declaratory judgment pursuant to N.J.S.A. 2A:16-50 et seq. against defendants, Great Atlantic & Pacific Tea Co., Inc. (A & P) and Community Distributors, Inc., t/a Drug Fair (Drug Fair). Answers were filed by A & P and Drug Fair and, thereafter, Drug Fair counterclaimed against Berkeley and cross-claimed against A & P.
Berkeley has now moved for summary judgment. Both Berkeley and Drug Fair request that this court construe the terms of a lease and an "Agreement of Sublease" and make certain determinations and declarations. Counsel for A & P has submitted a letter stating that it would take no position on the motion.
The parties have stipulated that all discovery has been concluded in this case. Since there are no disputes as to any material facts, the case is ripe for summary judgment. This court has, therefore, proceeded to render its decision. Judson v. Peoples Bank and Trust Company of Westfield, 17 N.J. 67, 73-75 (1954).
Berkeley, the landlord, is the owner of a small shopping center commonly known as Berkeley Heights Shopping Center (shopping center). On February 1, 1965, A & P became a tenant within the shopping center at 400 Springfield Avenue, Berkeley Heights, occupying one store consisting of 11,514 square feet of retail space.[1] A & P, which intended to operate a supermarket, included within the lease agreement a covenant against competition. Addendum "F" to the lease stated as follows:

*233 The lessor [Berkeley] obligates itself not to lease, rent or permit to be occupied a store now owned by it or wherein it is interested for the sale of food or food products within the Shopping Center now owned by the lessor so long as lessee [A & P] handles food or food products at retail. This is not intended to exclude such stores as a restaurant, luncheonette, confectionery store, drug store or bakery. This restriction is also not intended to apply to a chain, variety or department store provided, however, that any food department operated by said chain or department store does not exceed 2,000 square feet total area.
It has been established that food or food products for retail sale were displayed in the entire retail area of the A & P store, except for a small area in which beauty aids and other non-food items were sold.
Although the initial lease term ended January 31, 1976, the lease, which provided for four renewal extensions of five years each, was duly renewed and extended and continues in full force and effect. On April 16, 1977, however, A & P informed Berkeley that it was closing the store and that it intended to lease the premises to Drug Fair. Accordingly, A & P ceased to operate its food retail store shortly thereafter.
A document entitled "Agreement of Sublease" was entered into on May 4, 1977 between A & P as "sublessor" and Drug Fair as "sublessee." In the agreement between A & P and Drug Fair, A & P purported to sublet its lease to Drug Fair. Paragraph 26 of the lease provides in part that:
Each and every provision of this lease shall bind and shall inure for the benefit of the parties hereto, their legal representatives, heirs, successors and assigns ...
and under paragraph 5A of the "Agreement to Sublease" it was provided that:
All of the rights and obligations contained in the overlease conferred and imposed upon the Sublessor (as Tenant therein) except as modified and amended by this Sublease, are hereby conferred and imposed upon Sublessee....
Drug Fair commenced business at the premises in July 1977.
It has been contended by Drug Fair that the primary business of the store at the premises is that of a "modern chain *234 drug store" which sells "food and foodstuffs, pharmaceuticals and general merchandise." At the same time, it has been admitted that the store devotes only 1,200 to 2,000 square feet to the sale of food or food products which accounts for only 7% to 10% of the entire retail space.
Berkeley now seeks to lease to a supermarket a store to be constructed on the premises. It contends, in sum, that the covenant against competition established in addendum "F" to the lease between Berkeley and A & P prevents Berkeley from leasing space to a supermarket elsewhere in the shopping center only as long as the lessee continued to sell food in a widely-varied supermarket operation. Since Drug Fair now occupies the premises, operating a modern chain drug store, Berkeley claims that the basis for the covenant against competition no longer exists. Berkeley insists that Drug Fair does not handle food or food products at retail to the extent sold by a supermarket and that the restrictive lease provision was clearly designed only to preclude the possibility of having two supermarkets in operation simultaneously at the shopping center.
Drug Fair, on the other hand, contends that it has the right, by virtue of its "Agreement of Sublease" with A & P, to enforce addendum "F" for its own benefit, thereby preventing Berkeley from leasing to a supermarket elsewhere in the shopping center.
It is initially necessary to decide whether the document entitled "Agreement of Sublease" is a sublease or is, in fact, an assignment. The extent of the rights that Drug Fair obtained from A & P will depend upon this determination. Before declaring whether Drug Fair can assert addendum "F" of the lease, it is necessary to determine whether Drug Fair can enforce such a restraint against Berkeley.
Assignment and subletting are naturally incident to a leasehold estate. They cannot be restricted unless by express stipulation to that effect. Baum v. Tazwell, 26 N.J. Misc. 292, 295 (Cir.Ct. 1948). Therefore, absent a negative covenant or *235 provision, a lease is as assignable as any other contractual right. Matlack v. Arend, 2 N.J. Super. 319, 331 (Ch.Div. 1949); Holmes v. Harris, 33 N.J. Super. 395, 403 (App.Div. 1954). At the same time, if a lease does not contain a provision restraining the lessee from subletting, the lessee may do so at its option, even over the landlord's objection. Braunstein v. McGrory Stores Corp., 93 N.J. Eq. 419, 420-421 (E. & A. 1922); Jenkins v. Kaplan, 53 N.J. Super. 582, 587 (App.Div. 1959). See also, Sinclair Refining Co. v. Clay, 102 F. Supp. 732, 735 (N.D.Ohio 1951), aff'd 194 F.2d 532 (6 Cir.1952); 1130 President St. Corporation v. Bolton Realty Corporation, 198 Misc. 198, 97 N.Y.S.2d 422 (Sup.Ct. 1950). In the present case, the lease between Berkeley and A & P contains no language which would prevent the lease from being either assigned or sublet to any third party.
The document entered into between A & P and Drug Fair is clearly entitled "Agreement of Sublease." Furthermore, A & P is called the "sublessor" and Drug Fair is called the "sublessee" throughout the agreement. If this court were simply to look at the form of the agreement, it would be constrained to find that the parties entered into a sublease. Consequently, the answer to the question initially posed would be clear. Drug Fair would be unable to attempt to enforce addendum "F" against Berkeley.
It is well established that a subletting creates the relationship of landlord and tenant between the sublessor and the sublessee. There is no privity of contract, Wehrle v. Landsman, 23 N.J. Super. 40, 46 (Law Div. 1952); Baum, supra, 26 N.J. Misc. at 295, or estate between the landlord and the subtenant with the lessee standing as a buffer between the landlord and the subtenant. Marcellus v. K.O.V., Inc., 5 Kan. App.2d 339, 615 P.2d 170, 172 (1980). The sublease vests no right in the sublessee to enforce the sublessor's agreement contained in the original lease. Holiday Village Shopping Center v. Osco Drug, Inc., 315 F. Supp. 171, 174 (D.Mont. 1970). *236 Therefore, the insulation that exists between the prime tenant and the subtenant prevents the subtenant from enforcing against the landlord any rights given in the prime lease to the prime tenant. Employees' Consumer Org. Inc. v. Gorman's, Inc., 395 S.W.2d 162, 166 (Mo. 1965). See Friedman, Leases, § 7.701 at 324 (3 ed.).
Whether an agreement is an assignment or a sublease is not, however, dependent solely upon form. Rather than relying upon the title given to a transaction by the parties, a court must consider the actual terms and conditions of the agreement. See Jordan v. Scott, 38 Cal. App. 739, 745, 177 P. 504, 506 (Dist.Ct.App. 1918). Where the whole term of the lease is transferred by a lessee to a third party, the transfer is an assignment, not a subletting. Wilson v. Cornbrooks, 104 N.J.L. 418, 422 (E. & A. 1928); Stark v. Nat. Research and Design Corp., 33 N.J. Super. 315, 320-321 (App.Div. 1954); Dries v. Trenton Oil Co., 17 N.J. Super. 591, 596 (App.Div. 1952); 24 Broad Street Corp. v. Quinn, 19 N.J. Super. 21, 30 (Ch.Div. 1952). See also Schoshinski, American Law of Landlord and Tenant, 553-573 (1980) [hereinafter cited as Schoshinski]; Cribbet, Principles of Law of Property, 219-220 (2 ed. 1975); 22 N.J.Practice (LeWine, Landlord and Tenant Law) (1962), §§ 991-992. The lessee cannot retain some control or interest in the lease,[2]Estate of Whitley v. Anning, 392 So.2d 799, 800 (La. App. 1980), and he cannot reserve a reversionary interest in the leasehold estate. Groth v. Continental Oil Company, 84 Idaho 409, 373 P.2d 548, 549 (1962). A reversion is an absolute right of possession in the lessee after the expiration of the transferree's interest for a period of time however short. Schoshinski, op. cit., supra at 556-557. Retaining only a contingent right or possibility of possession such as the lessee's reservation of the power of reentry for non-payment *237 of rent or default does not constitute a reversion. Wilson, supra, 104 N.J.L. at 422; see also Thomas v. United States, 505 F.2d 1282, 1287, 205 Ct.Cl. 623 (1974); Schoshinski, op. cit., supra, at 557.
The agreement entered into between A & P and Drug Fair is an assignment. Reversionary rights are not retained by A & P and the substance of the document evidences a transfer by A & P of all of its interest in the store for the entire unexpired term of the lease. The entire premises at 400 Springfield Avenue, previously occupied by A & P, is now occupied by Drug Fair. More importantly, paragraph three of the agreement provided that the initial term would expire on January 30, 1981 and that Drug Fair would then be entitled to three, five-year renewal options. Under the lease agreement between A & P and Berkeley, A & P also would have had on January 30, 1981 the right to exercise three, five-year renewal options. Hence, A & P transferred to Drug Fair whatever leasehold interest it had.
Since the document is actually an assignment despite its being labeled as a sublease, this court holds that Drug Fair can assert whatever rights A & P would have been able to assert with respect to the enforcement of addendum "F." In an assignment, privity of estate is created between the lessor and the assignee, Packard-Bamberger & Co., Inc. v. Maloof, 83 N.J. Super. 273, 280 (Law Div. 1964), rev'd on other grounds 89 N.J. Super. 128 (App.Div. 1965), and, as a result, the assignee assumes the burden and accedes to the benefit of all real covenants. Paul v. Kanter, 172 So.2d 26, 27 (Fla.App. 1965); Rauch v. Circle Theater, 176 Ind. App. 130, 374 N.E.2d 546, 550 (1978). The assignee takes all that interest in the premises which his assignor had. Cf. Wehrle, supra, 23 N.J. Super. at 44. Additionally, paragraph 26 of the lease specifically entitles any assignee to receive the benefit of all of the lease provisions and addendum "F" is a provision in the original lease. See Braunstein, supra, 93 N.J. Eq. at 421 (where a provision of the *238 lease that provided that "This agreement of lease shall bind and apply to the heirs, executors, administrators, successors and assigns of the respective parties thereto," empowered an assignee of a lease to make any alterations or improvements that the lessee was authorized to make).
A determination must now be made as to the interpretation and application of addendum "F" which is clearly an agreement in restriction of trade. As a general rule, an agreement in unreasonable restraint of trade is illegal and void, but an agreement in reasonable restraint of trade is valid. Irving Investment Corp. v. Gordon, 3 N.J. 217, 221 (1949). None of the parties have contended that addendum "F" is an illegal restraint of trade and this court recognizes that such a provision is common in shopping centers. Tenants, principally prime tenants, negotiate and receive protection from competing similar businesses being conducted within a group of stores particularly in shopping centers. See generally Renee Cleaners, Inc. v. Gooddeal, etc., New Jersey, 89 N.J. Super. 186 (App.Div. 1965); Hiatt Inv. Co. v. Buehler, 225 Mo. App. 151, 16 S.W.2d 219 (1929); Annotation, 97 A.L.R.2d 4 (1964).
Berkeley obviously believes that since it now has the opportunity to place a supermarket in the shopping center, it is good business practice to encourage such use to stabilize the economic viability of the shopping center which will inure to the benefit of all of the tenants. In fact, Berkeley argues that it would be a disservice to the shopping center to allow Drug Fair to obtain the benefit of the anticompete clause and thereby bar a supermarket  the only supermarket  from the leased premises. Indeed, the economic value to a shopping center of operating a supermarket has been recognized in this State. In Ingannamort v. Kings Super Markets, Inc., 55 N.J. 223, 229 (1970), the court cited to Lilac Variety, Inc. v. Dallas Texas Company, 383 S.W.2d 193 (Tex.Civ.App. 1964), which stated that:
We think it is common knowledge that the volume of pedestrian traffic at the site of a retail merchandising business is a factor which affects the gross sales *239 potential of the business. That being so, purpose and importance to appellants of ... a supermarket are obvious. [Id. at 196]
Supermarkets are clearly bellwether tenants and are recognized as being anchor tenants around which are located satellite stores of a smaller variety within the shopping center. Each store supplements the other by attracting to one location a number of stores offering a variety of products to permit one-stop shopping.
Berkeley claims that due to the importance of a shopping center, it would have been contrary to its economic interests to limit the commercial viability of its property by granting broad restrictive covenants for the premises. Moreover, Berkeley argues that A & P would not have had any interest in entering into a restrictive covenant that would have prevented competition from any type of enterprise other than their own supermarket. It is Berkeley's contention, therefore, that Drug Fair, which is a store which sells some food products, but does not reach the dimensions of a supermarket, is simply not the type of store contemplated by addendum "F."
While Berkeley insists that since addendum "F" is part of an A & P form lease and should, consequently, be strictly construed against A & P, Drug Fair responds by contending that if it was Berkeley's intention to have the anti-compete covenants operate only for as long as the demised premises were actively operated as a supermarket, clear language could have been inserted which defined "supermarket" and also placed upon the tenant the obligation of the continuous operation of a supermarket.
It has previously been held that a covenant against competition must be construed in light of both the circumstances in which it was written and the purposes, expressed or implied, of the parties in effectuating their agreement, so as to give the language a rational nature consistent with the purpose. Cragmere Holding Corporation v. Socony-Mobil Oil Company, 65 N.J. Super. 322, 325 (App.Div. 1961); see Casriel v. King, *240 2 N.J. 45, 50 (1949). In construing addendum "F," therefore, this court will be required to decide what the lease would have provided for had the parties anticipated the present situation. Terms, although not specifically set forth, may be implied where the parties must have intended them
`because they are necessary to give business efficacy to the contract as written, or to give the contract an effect which the parties, as fair and reasonable, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.'
[Renee Cleaners, supra, 89 N.J. Super. at 190 (quoting from William Berland Realty Co. v. Hahne & Co., 26 N.J. Super. 477, 487 (Ch.Div. 1953), mod. on other grounds 29 N.J. Super. 316 (App.Div. 1954)]).
At the same time, while deciding what the lease would have provided for, this court has to be cognizant of the fact that restrictions on the use of property should be strictly construed. Renee Cleaners, supra, 89 N.J. Super. at 189; Nevada Food King, Inc. v. Reno Press Brick Co., 81 Nev. 135, 400 P.2d 140, 142 (1965); Sherrer v. Sparks, 78 S.W.2d 1035 (Tex.Civ.App. 1935). Moreover, the words relied upon as creating a covenant not to compete should not be extended beyond the literal meaning and if two constructions are possible, the one which does not limit the use of the property should be adopted. Keyes v. Carrick, 268 S.W.2d 397, 402 (Ky. Ct. App. 1954); Topol v. Smoleroff Development Corp., 34 N.Y.S.2d 653, 654, 264 App.Div. 164 (1942); see also 51 C.J.S., Landlord and Tenant, § 238 (1955).
It is reasonable to assume that when Berkeley and A & P entered the lease agreement, Berkeley had envisioned that a supermarket would be its anchor tenant and that when Berkeley restricted its right to rent out other space in the shopping center to a supermarket, it did so with the understanding that one supermarket would exist within the shopping center. Under the circumstances, since addendum "F" provided that the restriction would apply "so long as lessee handles food or food products at retail," it is reasonable to assume that Berkeley *241 would only have wanted the restriction to exist as long as the premises were occupied by a business whose primary source of income was the handling of food or food products at retail. Drug Fair, which considers itself to be a modern chain drug store, does not sell food to the extent Berkeley would have expected from a store that would occupy the premises at 400 Springfield Avenue.
It also does not make any economic sense for the court to permit Drug Fair to assert addendum "F." Blocking the introduction of a supermarket will retard the growth of the shopping center. Whatever impact a new supermarket will have on Drug Fair's business will be minimal because food products occupy an insignificant portion of the store. Drug Fair, which has a food department which does not exceed 2,000 square feet, total area, is itself the type of store that would be a permitted exception to the restrictive covenant pursuant to addendum "F" if it had operated somewhere else in the shopping center at the same time a supermarket was in operation in the shopping center. It would now be illogical and unfair for this court to allow Drug Fair to assert the restrictive covenant that was only meant to apply for the benefit of a supermarket.
Drug Fair has submitted that the affirmative defenses of equitable estoppel and laches are applicable to the present situation. Drug Fair insists that it has continually operated a substantial retail operation at the premises for the past nine years and that Berkeley has never, during this time, complained about the adequacy of Drug Fair's operation as a lead store. Additionally, Drug Fair submits that Berkeley has for nine years enjoyed the rents from A & P that have originated from Drug Fair and that, consequently, Berkeley should now be prevented from challenging the invalidity of addendum "F."
Equitable estoppel has been defined in Carlsen v. Masters' Mates & Pilots Pension Plan Trust, 80 N.J. 334 (1979) as being:

*242 The effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been lead thereby to change his position for the worse.... [At 339]
The Court in Carlsen also recognized that equitable estoppel concerns conduct which amounts to a misrepresentation or concealment of material facts which are known to the party allegedly estopped and unknown to the party claiming estoppel which is done with the intention or expectation that it will be acted upon by the other party on which the other party does, in fact, rely in such a manner as to change his position for the worse. Ibid. Equitable estoppel is, as noted in Carlsen, a doctrine "designed to prevent a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience.'" Ibid.
Applying the facts to the doctrine of estoppel, this court finds the defense to be inapplicable for the following reasons: (1) Berkeley could not have prevented the use and occupancy of the demised premises by Drug Fair since A & P had the right to assign the lease to Drug Fair and Drug Fair's use was permitted under the exceptions to addendum "F" of the lease; (2) Berkeley, therefore, had no existing rights which it could otherwise assert against Drug Fair since Drug Fair's use and occupancy of the store was permitted; (3) there is no evidence that Drug Fair relied in good faith upon any conduct of Berkeley since Drug Fair is charged with knowledge of the underlying lease and addendum "F"; (4) addendum "F" is determined to require the use of the store as a supermarket whose primary business is food products, whereas Drug Fair's business is primarily non-food products; and (5) consequently, there is no evidence that Drug Fair was led to detrimentally change its position since until recently Berkeley had no prospective tenant to use a portion of the shopping center for supermarket purposes and Drug Fair is not a supermarket. If Berkeley now contended that there was no right to sublet or to assign the lease after nine years or that Drug Fair had no right *243 to occupy the store, then the passage of nine years would estop Berkeley under those circumstances, which are not present here.
The affirmative defense of laches is an equitable defense. A party asserting its application must show that the adversary "without explanation or excuse, delayed in asserting a claim now stale, that the delay was unreasonable under the circumstances, and that it `visited prejudice upon the party asserting the delay.'" Allstate v. Howard Savings Inst., 127 N.J. Super. 479, 489 (Ch.Div. 1974). It was further recognized in Allstate that:
Laches involves more than mere delay, mere lapse of time. To deserve that category, that delay must be for a length of time which unexplained and unexcused, is altogether unreasonable under the circumstances, and has been prejudicial to the party asserting it or renders it very doubtful that the truth can be ascertained and justice administered. [Ibid. (quoting from Stroebel v. Jefferson Trucking & Rigging Co., 125 N.J.L. 484, 487 (E. & A. 1940).])
Berkeley's claim that it should be permitted to allow a supermarket in the shopping center is not a stale claim. Whether a claim is stale is based on whether a party had a reason to assert the claim at an earlier date but has failed to do so. The uncontroverted evidence is that there was no prospective supermarket tenant interested in the shopping center until recently, and no prejudice has been demonstrated by Drug Fair. There has been no showing that the percentage of store space allotted to the sale of food products has varied or increased since the assignment was given to Drug Fair, and it offered no evidence that its business would be adversely affected by the introduction of a supermarket in the shopping center. Consequently, this situation Drug Fair finds itself in presently with respect to the sale of food is exactly the same situation it was in nine years ago when it first obtained the assignment from A & P.
Thus, the motion for summary judgment is hereby granted to plaintiff and, accordingly, Berkeley can grant a tenancy within the shopping center to a supermarket. An order consistent with this judgment shall be submitted forthwith.
NOTES
[1] The shopping center is located on Block 701, Lot 3 on the tax map of Berkeley Heights, consisting of approximately nine acres within which is substantial vacant land. An additional series of stores, constructed earlier, are located on Lot 2; both parcels being owned by plaintiff and which physically operate together with the stores on Lot 3 as one shopping center with a sharing of parking, particularly on Lot 3. There are a total of approximately 18 stores. Drug Fair operates a store on Lot 3. There are several stores that sell food products, including a Chinese restaurant, a health food store and a dairy food store which comprise exceptions as set forth in addendum "F" of the lease.
[2] An obligation to pay additional rent may create a subtenancy. See D.A.C. Uranium Company v. Benton, 149 F. Supp. 667, 677-678 (D.Colo. 1956). Drug Fair admits that no additional rent was paid to A & P by Drug Fair.