BECKY MCSPADDEN, Appellant-Respondent, v ROBERT N. DAW-SON, Respondent. PACER REALTY ASSOCIATES, LTD., et al., Respondents-Appellants.

First Department, June 10, 1986

## APPEARANCES OF COUNSEL

*Charles B. Manuel, Jr.,* of counsel *(Morgan, Lewis & Bockius,* attorneys), for appellant-respondent.

*Philip Damashek* of counsel *(Damashek & Bezoza,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal involves the competing claims of plaintiff Becky McSpadden and her former boyfriend, defendant Robert Dawson, for the exclusive right to purchase the cooperative shares allocated to a two-bedroom rent-stabilized apartment at 11 Riverside Drive in New York City. The apartment, which is part of a cooperative conversion offering filed pursuant to General Business Law § 352-eeee, has been McSpadden's home for the past 10 years, during the last 7 of which, after Dawson moved out, permanently, in 1979, she has been its exclusive occupant. The sponsor of the conversion, a self-styled "bystander" to the dispute, although nominally a defendant, has never asserted an independent claim to the apartment, has not yet accepted either party's application, and will abide by the court's decision and sell to either or both of the parties, as directed. After a trial, nonjury, Trial Term declared McSpadden and Dawson to be "co-tenants for the purpose of jointly subscribing" for the purchase of the cooperative shares allocated to the apartment. Since that judgment relies on factual premises without support in the record and is contrary to applicable law, we reverse and declare that McSpadden has the exclusive purchase rights with respect to the apartment.

The evidence at trial is essentially undisputed. Dawson and McSpadden moved into the apartment in December 1975 pursuant to a three-year lease signed solely by him and naming him as the tenant. At the expiration of the original lease Dawson executed a one-year renewal naming himself as the sole tenant. It is uncontroverted, however, that McSpadden found the apartment, and that Dawson signed the original lease and renewed it on behalf of both of them. McSpadden testified that she did not sign the original lease because she knew from previous experience that her signing would decrease the couple's chances of securing a desirable apartment. She advanced the required $1,500 for two months' rent and the security deposit. During their period of cohabitation at the

apartment the couple shared expenses, including rent and utilities.

Eventually, however, the relationship, which was increasingly marked by discord, deteriorated to the point where Dawson moved out in April 1979. As subsequent history has demonstrated, the breakup was final and irrevocable. It was, however, neither sudden nor impulsive. In fact, Dawson had been planning to leave for at least two months, having, during that time, secured a new apartment on West 77th Street, where for the past seven years, he has maintained his primary residence, using it as such for all official purposes, including voting. Before moving out, and repeatedly thereafter, he renounced any interest in the Riverside Drive apartment. As a mutual friend, Susan Marsee, testified, "Of course, they split up, Mr. Dawson said he wanted nothing more to do with the apartment * * * He just wanted out."

Between April 1979, when Dawson left the apartment, and September 1979, when he signed a lease renewal, he and McSpadden held two meetings with respect to the apartment. At the first, held in April, shortly after he left, Dawson disclaimed any interest in the apartment and placed no limitations on McSpadden's use of it. In return, however, he insisted on receiving checks for the entire amount of each month's rent before he would send his own check to the landlord. In fact, he even required McSpadden to pay him for the extra security deposited at the time of the 1978 renewal and the fuel surcharge that had accrued from December 1978 to April 1979. The second meeting, which Ms. Marsee attended, was held in September 1979, just before the renewal lease was to expire. Dawson, again disclaiming any interest in the apartment, agreed in writing to renew the lease so as to enable McSpadden to continue in occupancy. In return, since it was anticipated that she would begin paying the rent directly to the landlord, she agreed to deposit $3,000 in an escrow account to secure him in the event she defaulted.[1] She also promised to obtain the landlord's consent to substitute her name for his on the lease.

Review of the record reveals that at no time during the September 1979 meeting or, for that matter, at any other time (until he discovered he might profit from the cooperative

1. This sum, representing approximately four months' rent, was more than adequate to cover the brief period needed to relet a rent-stabilized apartment.

conversion) did Dawson ever express the desire to reserve any interest in the apartment. As the testimony indicates, even as he was agreeing to sign the 1979 lease renewal which would permit McSpadden to remain in occupancy, he once again firmly renounced any personal interest in the apartment. Dawson's testimony as to the September 1979 meeting is not to the contrary. Indeed, despite a fumbling attempt to correct it, he came very close to admitting his complete renunciation of any interest in the apartment, stating that, "I just said, I did not want to have anything to do with it."

Except for one or two brief visits to remove his possessions and the September 1979 meeting, Dawson has not even set foot in the apartment since his April 1979 departure. He does not have a key to it, and, indeed, was personally unaware that the lock had been changed seven years ago. On the other hand, McSpadden has, since April 1979, paid the rent, estimated to be in excess of $68,000, and any security deposit increase. From April 1979 to January 1981, when she began to pay the rent directly to the landlord, Dawson's role in the payment of rent was that of a mere conduit. His check register indicates that he credited her checks to him as "Becky's rent" and debited his own checks to the landlord in the same manner. Indeed, since January 1981, when she began paying the landlord directly, he has not even had any way of knowing whether the rent was being paid.

Moreover, and contrary to Trial Term's finding, McSpadden signed the 1979, 1980 and 1983 renewal leases, and her name was also inserted, as a tenant of record, on the 1983 lease. In fact, according to her testimony and that of Ms. Marsee, the parties agreed at the September 1979 meeting that ultimately her name would replace Dawson's on the lease. Thus, Trial Term's finding that "[McSpadden] never sought to emerge as a tenant in her own right and accept legal liability for rent and other tenancy obligations", is without factual support.

The right to purchase the shares allocated to a rent-stabilized apartment at the insider's price under an offering plan to convert the apartment to cooperative ownership is, pursuant to Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code) § 61 (5), limited to "tenants in occupancy and lessees of record of vacant or subleased apartments at the time of the offering". The offering plan here tracked the statutory language in that regard and, as accepted for filing by the Attorney-General, was presented to the tenants on March 25, 1983, which, for purposes of fixing the

"time of the offering", is the critical date. *(Rakowski v Rakowski,* 109 AD2d 1, 7; *Wissner v 15 W. 72nd St. Assoc.,* 87 AD2d 120, 123, *affd* 58 NY2d 645; *Apfelberg v East 56th Plaza,* 78 AD2d 606.)* That McSpadden was not a named tenant on that date is of no moment since her claim turns, not on her status as a tenant of record, but as the tenant in occupancy, a status which, she contends, she has enjoyed since Dawson's departure in April 1979. Neither the Rent Stabilization Law (Administrative Code of City of New York § YY51-1.0 *et seq.)* nor the Code defines the term "tenant."

Where there are adverse claims to the status of tenant in occupancy, resolution of the issue should turn on a practical analysis of the relationship of the competing parties to the demised property, not necessarily on whose name happens to appear on the lease. As already noted, the landlord/sponsor does not now and, in fact, has never challenged McSpadden's status as a tenant. Since Dawson's departure she has, without objection, exclusively occupied the apartment for the full terms of three renewal leases, signed in 1979, 1980 and 1983. The apartment has been her home for the past 10 years. Meanwhile, for the past seven years Dawson has lived elsewhere.

It is clear that at the time of their breakup, Dawson, the tenant of record, relinquished all of his rights to the apartment in deference to McSpadden and that he had no intention of returning. He had made other living arrangements, of a more than merely transitory nature. And, while he renewed the lease later that year in his own name, he was obviously motivated by a desire to facilitate her continued rights to the apartment. It had been her home for four years. Indeed, in agreeing in a September 28, 1979 writing executed by both parties to sign a one-year renewal lease and allow McSpadden exclusive possession in exchange for the payment of a $3,000 escrow deposit, Dawson clearly indicated that he viewed himself as merely the instrumentality for the renewal of the lease.

Trial Term apparently rested its decision on two circumstances, namely, the continued presence of Dawson's name on the leases and his testimony of his intention to return to the apartment. The renewal of the leases in Dawson's name, while relevant, is only one factor to be considered. In any controversy over an assignment of a lease or abandonment of rights thereunder, the rights and obligations of a tenant of record out of possession have to be considered. That the lease names

a party against whom or in whose behalf rights are asserted is often the starting point for inquiry in such cases; it is not, however, conclusive on the question of whether a named tenant has abandoned or assigned his leasehold interest.[2]

The other factor upon which Trial Term relied, Dawson's alleged intention to return to the apartment if McSpadden ever moved, is insufficient by itself to create a legally cognizable reversionary interest. It should be noted that this intention, never disclosed to McSpadden, or anyone else for that matter, remained inchoate until Dawson's discovery in 1983, four years after he had abandoned the apartment permanently, that he might profit from the cooperative conversion. In the interim, he had never asserted any right to the apartment or attempted to reclaim it; he never visited the apartment except to remove his possessions; he never listed it as his address; he never asked for a key; and he resided in another apartment under leases which he repeatedly renewed.

Even in answering his own attorney's question, designed to elicit a favorable response, Dawson was unable to express any concrete intention to return to the apartment in the future:

"Q: Did you have any intentions of abandoning the apartment or giving up the apartment?

"A: Sometime, I did not know what to do. I tried to just figure out what to do. I guess it must have been several days after I left. I somehow got in touch with her. Maybe I called Susan [Marsee], because I knew we were going to have to resolve something. They began making demands on me
* * *

"THE COURT: How come [you signed the renewals]?

"THE WITNESS: It was a great apartment. I did not think she was able to come back. I would get back in there."

Aside from being undercut by McSpadden's proven financial ability, as shown by her deposit of four months' rent in an escrow account and payment of $68,000 in rent from April 1979 to date, this hope of reoccupying the apartment was insufficient as a matter of law to create any reversionary

---

2. Nor is the fact that Dawson continued to be liable on the lease dispositive. Absent a novation, an assignor of a lease has a continuing liability, which in no way affects the efficacy of the assignment. Nor did Dawson's continuing liability under the lease accord him any greater rights to purchase in this instance. (See, Howard Stores Corp. v Robison Rayon Co., 36 AD2d 911 [tenant who assigned leasehold rights remained bound by lease covenant to pay rent but forfeited its right to reenter].)

rights in the leasehold. Even if it had been communicated, it represented, at best, a contingent right of reentry, a form of future interest which is insufficient to preserve any reversionary interest. *(See, Stewart v Long Is. R. R. Co.,* 102 NY 601; *Herzig v Blumenkrohn,* 122 App Div 756.)

Nor is *Spitalnik v Springer* (87 AD2d 797, *mod on other grounds* 59 NY2d 112), upon which Trial Term relied, especially helpful, since that case is readily distinguishable from the instant matter. There, two cotenants, who were unmarried, jointly occupied premises pursuant to a lease which they both executed. The parties had an "on-again, off-again" relationship, such that the brief absence of one of them for three months was not considered an abandonment of her rights as a cotenant. In sharp contrast, this case involves a final, permanent separation, which had, on the date of presentation of the offering plan, ripened into a four-year absence from the apartment. Even beyond that, however, Dawson's absence has now extended over a period of seven years. Other than to sign the renewal leases, and to exploit that fact in order to subscribe to the offering plan at the insider's price, he has had nothing to do with the apartment. Such indifference evinces an intent to abandon whatever interest he might otherwise have had in the leasehold. In *Rakowski v Rakowski* (109 AD2d 1, 7, *supra),* the court ruled that a former wife, a tenant of record, had "manifested an intent to relinquish her rights to the apartment by removing her person and all of her property from the apartment several months before [the date of presentation of the offering plan], and by failing to pay the rent or to make sure that rent was being paid, although obligated to do so, during that period."

Nor does Dawson's signing of the lease renewals offset the strong evidence of abandonment. In signing the 1980 and 1983 renewals, he never asserted any present or future interest in the apartment. He merely responded to McSpadden's request for help in retaining the apartment by repeating what he had done for her in 1979. At that time, it will be recalled, he renewed the lease while at the same time explicitly renouncing all interest in the apartment.[3] In fact, Dawson relied on McSpadden to bring the lease renewals to his attention and to

---

3. Equally perfunctory, and in no way affecting McSpadden's rights vis-à-vis Dawson, was her use of the phrase "aka Dawson", which was inserted over her own imprinted name on her rent checks. Dawson never saw the checks and there is no evidence that he requested such insertion. Thus, rather than evidencing "her acknowledgement of defendant's rights in

deliver them to the landlord, conduct which is consistent with a relinquishment of his leasehold rights.

Dawson also advances a claim of entitlement to purchase at the insider's price as a lessee of record of a subleased apartment under Rent Stabilization Code § 61 (5). This argument fails. When a lessee has parted by sublease with his entire interest in the demised premises without any right of reversion an assignment of the lease is effected by operation of law. *(New Amsterdam Cas. Co. v National Union Fire Ins. Co.,* 266 NY 254; *Mann v Munch Brewery,* 225 NY 189; *Stewart v Long Is. R. R. Co.,* 102 NY 601, *supra.)* Thus, in those cases where the tenant has reserved some portion of the remaining term of the lease to himself he has been held to retain the right to purchase. *(See, e.g., Thuna v Di Sanza,* 102 Misc 2d 342, *affd* 78 AD2d 517; *Wittenberg v Herr,* 121 Misc 2d 377 [series of sublease extensions, each clearly ending before expiration of main lease and one explicitly preserving purchase rights]; *Trachter v Parker 86th Assoc.,* 115 Misc 2d 271 [sublease explicitly for a fixed term that did not encompass the full term of the underlying lease].) On the other hand, a subletting for the entire term of the lease without any express reservation of a reversionary interest is considered, by operation of law, an assignment. *(New Amsterdam Cas. Co. v National Union Fire Ins. Co.,* 266 NY 254, *supra; Bostonian Shoe Co. v Wulwick Assoc.,* 119 AD2d 717; *Mann Theaters Corp. v Mid-Island Shopping Plaza Co.,* 94 AD2d 466, *affd* 62 NY2d 930.) Dawson's claim that he has merely sublet the apartment to McSpadden cannot succeed because he has failed to come forward with any evidence to controvert the inference to be drawn from the parties' conduct over the past seven years. The mere conclusory allegation by a tenant of record that he intended to retain a reversionary interest in the demised premises is, without more, insufficient.

Finally, we note that Trial Term excluded evidence which, in our view, was relevant on the issue of Dawson's relinquishment of his leasehold rights in the apartment to McSpadden. She should have been permitted to introduce evidence to show the substantial and permanent quality of the improvements she claims to have made in the apartment. The nature and extent of these improvements would tend to show that she understood herself to have unlimited occupancy rights and

---

regard to the apartment" as Trial Term found, it is clear, as she testified, that McSpadden herself decided to use the phrase to appease the landlord.

also support her testimony that Dawson never communicated any further interest in the apartment to her. The other area of excluded evidence related to Dawson's treatment of her rent checks and to his long-term intentions with respect to his new West 77th Street apartment. As to the former, the court unduly circumscribed questioning of him regarding his use of the term "Becky's rent" in his checkbook. As for his treatment of his West 77th Street apartment, it erroneously precluded questioning designed to show that he executed leases on his new apartment, the terms of which lasted well beyond the time remaining on the lease for the contested apartment. This evidence was relevant on the question of Dawson's retention of a reversionary interest in the apartment in question. As already indicated, however, even without this evidence, the record is more than adequate to demonstrate Dawson's relinquishment of his leasehold interest to McSpadden.

Accordingly, the judgment (denominated an order) of the Supreme Court (John G. Dier, J.), entered August 22, 1985, should be reversed, on the law and on the facts, without costs or disbursements, and a declaration made that plaintiff as the tenant in occupancy is entitled to purchase at the insider's price.

KUPFERMAN, J. P., SANDLER, CARRO and ASCH, JJ., concur.

Judgment (denominated an order), Supreme Court, New York County, entered on or about August 22, 1985, unanimously reversed, on the law and on the facts, without costs and without disbursements, and a declaration made that plaintiff as the tenant in occupancy is entitled to purchase at the insider's price.