## In re SERVICE MERCHANDISE COMPANY, INC., et al., Debtor.

### No. 399–02649.

United States Bankruptcy Court, M.D. Tennessee.

June 5, 2000.

---

John William Butler, Jr., George N. Panagakis, Skadden, Arps, Slate Meagher & Flom, Chicago, IL, Paul G. Jennings, Beth A. Dunning, Bass, Berry & Sims PLC, Nashville, TN, for debtors.

Ellen B. Vergos, United States Trustee, Region 8, Memphis, TN, Beth Roberts Derrick, Assistant United States Trustee, Nashville, TN, for Office of United States Trustee.

Glen B. Rose, Barbara Holmes, Harwell Howard Hyne Gabbert & Manner, P.C., Nashville, TN, Glen B. Rice, Otterbourg, Steindler, Houston & Rosen, New York City, for Official Unsecured Creditors' Committee.

Robert C. Goodrich, Ronald G. Steen, Jr., Farris Warfield & Kanday, PLC, Nashville, TN, for Melaver, Inc., ITR Property Company, and RC Properties.

Sam J. McAllester, III, Wyatt Tarrant & Combs, Nashville, TN, for Oakwood Plaza, L.P.

B. Gail Reece, Wyatt Tarrant & Combs, Nashville, TN, for Segal Development Associates, L.P.

Randal S. Mashburn, Baker Donelson Bearman & Caldwell, Nashville, TN, for Baton Associates.

John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, for Hawley Management, Inc.

Marshall L. Hix, Beverly Haden, Hix Gray & Dennen, PLLC, Nashville, TN, for Chase Family L.P. No. 4.

Paul S. Magy, Matthew Schlegel, Ian Allen, Kupeliam Ormond & Magy, Southfield, MI, for Ramco–Gershenson Properties, L.P.

Andrew Conway, Miro Weiner & Kramer, Bloomfield Hills, MI, Jeffrey Meyers, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for Oakland Square L.P.

Steven T. Hoort, Rupes & Gray, Boston, MA, for TJX Companies, Inc.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, James Carr, Robert Shenfield, Lisa Thompson, Kelley Drye & Warren, LLP, New York City, for Westmoreland Mall Associates.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, for Jackson Simon, L.P.

David L. Pollack, Jeffrey Meyers, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, Randal S. Mashburn, Baker Donelson Bearman & Caldwell, Nashville, TN, for New Plan Excel Realty Trust, Inc. and General Growth Management, Inc.

Ernest B. Williams, IV, David Canas, Williams & Prochaska, P.C., Nashville, TN, for Castleton Shopping Center, Ltd.

John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, Lauren M. Iscoff, Kozyak Tropin & Throckmorton, P.A., Miami, FL, for Pompano Plaza, Ltd.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, James Carr, Lisa Thompson, Kelley Drye & Warren, LLP, New York City, for Westmoreland Mall Associates & Swansea Mall, LLC.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, James F. Wallack, Christine D. Lynch, Goulston & Starrs, P.C., Boston, MA, for E & A Northeast L.P.

Robert C. Goodrich, Farris Warfield & Kanday, PLC, Nashville, TN, for Heritage Realty Management, Inc.

Patrick M. Thomas, King & Ballow, Nashville, TN, Edwin G. Rice, Glenn Rassmussen Fogarty & Hocker, P.A., Tampa, FL, for Argyle Village Square Shopping Center, L.P.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, for Bennett Management Corporation, Newstart Factors, Inc., Bennett Restructuring Fund, L.P., and Bennett Offshore Restructuring Fund, L.P.

David Kleinfelter, Nashville, TN, Thomas M. Mayer, Phillip Bentley, Amy Caton, Kramer Levin Naftalis & Frankel, LLP, New York City, for Contrarian Capital Management LLC, Touchstone Capital, LLC, and Varde Partners.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

### I. Introduction

This matter is before the court on the debtors' motions for entry of eleven separate orders pursuant to 11 U.S.C. § 363 and Rule 6004 of the Federal Rules of Bankruptcy Procedure, authorizing the debtors and TJX Companies, Inc. to enter into various leases and subleases of space at eleven of the debtors' retail stores. The debtors sought this relief as to a total of nineteen stores, and eight of those transactions were previously approved by the court. The remaining eleven landlords each filed objections to the debtor's proposed transaction with TJX.[1] For the reasons more particularly described herein, the court grants the debtor's motion to sublease space to TJX Companies, Inc. under the specific conditions set forth by the court. The following constitutes this court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

### II. Brief Factual History and Summary of the Parties' Arguments

Service Merchandise and 31 of its affiliates (hereinafter "debtors") filed a voluntary chapter 11 on March 27, 1999. The debtors are among America's leading retailers of jewelry, gift and home decor products. For the fiscal year ended January 2, 2000, the debtors had consolidated net revenues of approximately $2.2 billion and administered approximately $1.2 billion of assets at book value. The debtors declared publicly upon filing that they intended to reorganize and emerge successfully from chapter 11 in the spring of 2001.

By this motion, the debtors seek to consummate a proposed transaction with TJX, whereby TJX will lease or sublease space at TJX Stores. To the extent the debtors own a particular store in fee simple, the debtors will lease a portion of such store to TJX, and to the extent that the debtors lease a particular TJX store, the debtors will sublease a portion of such store to TJX. The debtors also request that the court order that the applicable leases, mortgages, and related documents as to which the debtors are bound do not prohibit, restrict, or otherwise prevent the leasing of subleasing of the respective portions of the TJX stores to TJX or that the interest of the parties to such documents will be adequately protected as provided by the offer of adequate protection made

---

1. The landlords that filed objections are as follows:

| Landlord | Store Number | Store Location |
|---|---|---|
| Temple Ridge Associates | 827 | Paramus, NJ |
| Melaver, Inc. | 157 | Savannah, GA |
| Ramco–Gershenson Properties, L.P. | 533 | Novi, MI |
| Oakland Square L.P. | 112 | Troy, MI |
| Baton Associates, L.P. | 431 | Tyler, TX |
| Hawley Management, Inc. | 820 | Danbury, CT |
| Chase Family L.P. | 187 | Middletown, NY |
| R–C Properties II Partnership | 78 | Lexington, KY |
| ITR Property Company | 294 | Slidell, LA |
| Oakwood Plaza L.P. | 239 | Hollywood, FL |
| Segal Development Associates, L.P. | 821 | Wayne, NJ |

by the debtors. Finally, the debtors request that the court approve the adequate protection, if necessary, of other parties' interests in such properties, including requiring the imposition of reciprocal non-disturbance and attornment agreements between the affected parties.

Eleven of the nineteen landlords oppose the motion. Their objections include but are not limited to the following: (1) the debtors must assume before they may sublease; (2) the proposed transaction is a *de facto* assumption and assignment, and thus the requirements of section 365 are applicable; (3) the sublease cannot extend beyond the court imposed § 365(d)(4) deadline; (4) the debtors are in default on monetary and non-monetary obligations under the lease; (5) the debtors are required to bring an adversary proceeding because the non-disturbance provisions sought by the debtors are in the form of injunctive and declaratory relief: (6) the landlords will be prejudiced if the court allows the contested matter to be treated as an adversary proceeding by their lack of preparation on the short notice provided by the debtors of all pleadings; (7) the rights of the landlord, tenant/debtor are governed by state law, and, among others, (8) the debtors have failed to provide sufficient financial information about the financial viability of TJX as a tenant.

The debtors formulated and announced their 1999 Stabilization Plan in July of 1999 focusing on specific EBITDAR goals and implementing key strategies in such areas as store closings, e-commerce, marketing, real estate analysis, and restructuring of its overall objectives as a retail concern. The 1999 Plan was successful when measured by the debtors' benchmark, whereby the EBITDAR target was 40% greater than projected for the nine-month period. The debtors successful stabilization effort was the cornerstone to creation and implementation of the 2000 Business Plan. The 2000 Business Plan was presented in March, 2000 and has been in effect before and since that time.

An integral part of the debtors' 2000 Business Plan is maximizing the debtor's assets with regard to its vast real estate holdings. The debtors plan to downsize and refurbish to adjust to their new business strategies which include expansion of jewelry and jewelry-related products; immediate exit from certain unprofitable hardline categories; inclusion of the internet into the business; reduction of selling and warehouse spaces within the stores; and reduction of work-force at all levels of the companies. Specifically, the debtors' 221 locations are scheduled to receive some form of capital improvements, including installation of internet kiosks and reduction of store selling space in the near term. Seventy to eighty stores are set for total refurbishment during the next six months, while the remaining majority of stores will undergo capital improvement remodeling during 2000 and 2001. The debtors are evaluating use of the remaining 50–60 stores as part of the debtors' long term plans.

The debtors plan to reduce the size of their current stores by approximately one-half. The space reduction will permit the debtors to utilize the remaining half of the space to generate revenue by sublease or other real estate transaction. It is this initiative that gives rise to the debtors' current motion regarding 11 stores sought to be sublet to TJX and the landlords objections thereto.

In support of their motion, the debtors called four witnesses. Mr. Sam Cusano is the debtor's Chief Executive Officer and he testified at length about the implementation of the debtors' 1999 Stabilization Plan and how the debtors established their 2000 Business Plan. He explained that to date, the debtors are approximately 70% higher in continuing EBITDAR than in the previous year, and are approximately 30% higher than target for 2000 for the five month period ending May 31, 2000.

Mr. Cusano described the current layout of a typical Service Merchandise store

with approximately 30,000 square feet of warehouse space and 20,000 square feet of retail space. He testified that the debtors plan to spend several hundred thousand dollars per store on refurbishments at no cost to the landlords. These improvements include pushing back the rear wall of the sales area increasing selling space and decreasing warehouse space. In connection with the conversion of the warehouse space, the debtors will make improvements to the wiring, heating, air conditioning, and interior finishes of all walls. In essence the space would be split in half with separate heating and air, bathroom facilities, security systems, doors and wiring for each of the tenants. All of these improvements are to be made by the debtor and/or TJX, but at no cost to the landlord.

Mr. Cusano explained that the debtors launched a massive effort to identify potential contacts for the subleasing program. The debtors received an overwhelming response and began negotiating with TJX as a result of the subleasing campaign. Mr. Cusano explained that the debtors' decision to enter into the TJX transaction was in the best business judgment of the debtors and the transaction is in the best interest of all interested parties, including the landlords. According to Mr. Cusano and other evidence, TJX is the leading off-price retailer of apparel and home fashions in the United States and world-wide. TJX operates over 1,300 stores globally and in 1999 had sales that equaled almost $9,000,000,000 with over $500,000,000 in income.[2]

As to the specifics of the sublease, Mr. Cusano explained that the subleases were intended to be subject to the primary lease and that the subtenant would be responsible for its pro rata share of expenses such as taxes and CAM charges. It was also Mr. Cusano's testimony that in exercise of the debtors' best business judgment the sublease is in the best interest of all par-

ties in that the debtor would see approximately $4,500,000 per year in sublease income, and persons with an interest in property would receive incremental value while mitigating potential claims of the landlords.

Mr. Bernard Douton, an investment banker at Rothschild, Inc. testified, that the subleasing program, when fully implemented, will generate approximately $23,000,000 in incremental EBITDAR. This will translate into enterprise value for the creditors in the range of $150,000,000 to $160,000,000. Finally, Mr. Douton testified that the subleasing strategy was an important element in the 2000 Business Plan.

Next, the debtors called Mr. Richard Hauer. Mr. Hauer is a real estate advisor with D.G. Hart Associates, Inc. employed by the debtors, at the suggestion of the Creditors' Committee, to assist in the evaluation of the debtors' real estate holdings. Specifically with regard to the debtors' subleasing strategy, Mr. Hauer testified that D.G. Hart advised the debtor that the subleasing program was in the best interest of the estate. This is true, according to Mr. Hauer, because the subdivision of 50,000 square foot "boxes" into 25,000 square foot boxes would suit the debtors' new business objectives and provide a box that would be easier to market or remarket for lease. He testified that D.G. Hart advised the debtor that value would be added to the landlords and others with an interest in the subject properties by increasing traffic flow with an additional high-profile tenant, provide important capital improvements at no expense to the landlord, and most importantly provide a strong tenant to pay rent to the debtors, or in the event of rejection or termination of the primary lease, to the landlords that is at today's market rents.

■ In D.G. Hart's advice to the debtor, it suggested that the payment of rents was

---

**2.** Some of the landlords raised the issue of the financial viability of TJX. The proof of TJX's financial strength was unrebutted and therefore that objection is hereby overruled.

advantageous to the debtors and the landlords because in the aggregate TJX would be paying 100% of the rent obligations for only 50% of the space. In other words, the TJX rent for 50% of the space approximated the debtor's aggregate Primary lease obligations for 100% of the space at the eleven contested stores.[3]

Finally the debtors offered the testimony of Christina Lofgren. Ms. Lofgren is the vice-president of real estate for TJX. Ms. Lofgren testified specifically about the lease for Store No. 820 in Danbury Connecticut, that the TJX sublease would not violate any of the restrictive covenants found in the primary lease, particularly concerning tenant mix. Ms. Lofgren further testified that it contracted with the debtors to require the debtors to use their best efforts to obtain non-disturbance agreements on a consensual basis or through a court-sanctioned adequate protection arrangement. She affirmed that TJX was planning to spend about $1,300,000 in capital improvements per sublease and that TJX could walk away from the transaction if the non-disturbance assurances were not provided.

The landlords called two witnesses, Mr. David Bolger and Mr. James McCulla. Mr. Bolger, a principal Baton Associates, L.P., landlord of the Tyler, Texas location, testified unequivocally that he did not believe the sublease of ½ of the space to TJX benefitted him as a landlord in any respect. He explained that right now the debtors are obligated for all structural repairs and the sublease contains no such requirement. Furthermore, the capital improvements suggested by the debtors and TJX do not flow to the landlord because the landlord does not enjoy any increase in rent.

Likewise, Mr. McCulla, a principal in the entities controlling Oakwood Plaza in which Store No. 239 is located, testified that he did not feel that any of the capital improvement would flow through to the landlords. If Service Merchandise rejected the lease or the lease otherwise terminated, he would have only a 25,000 square foot space to find another anchor tenant, instead of a 50,000 square foot box. Furthermore, according to Mr. McCulla, only ½ of the rent and CAM charges would be paid if Service Merchandise rejected the primary lease.

On cross examination by each of the landlords, it was established that some of the obligations of the primary lease were not included in the sublease. Mr. Cusano conceded that the subleases did not require structural repairs as is found in most, if not all of the primary leases. Representative of the problem was Mr. Bolger's testimony. Specifically, he testified as follows:

> Well, for example, [the] roof obligation. Let's assume the roof leaks, [the property is] splintered. It's true, you have rent coming in from H.J. Wilson or Service Merchandise. But if Service Merchandise is no longer there, who is going to pay for the other half of the roof. We have an obligation that says that H.J. Wilson will pay for the entire roof. That is cherry-picking. The same thing with the driveway, [or the] parking lot needs repaved, structural damage. What happens if there is an earthquake, what happens if there's a fire and it's uninsured? What happens if you have a hillside that collapses with heavy rain? Under the terms of the Contract that we currently have, those obligations are

---

**3.** Some of the landlords raised an objection to Mr. Hauer's testimony as an expert based on the fact that the debtors had failed to produce a summary of his opinion and the bases for his opinion as is required by the Local Rules. The court took the objection under advisement and allowed all landlords to file coun-ter-affidavits to rebut any expert opinions raised by Mr. Hauer. The court sustains the landlords' objections. While Mr. Hauer testified permissibly as to what he and D.G. Hart advised the debtor, his testimony regarding any expert opinion as to subleasing initiative is stricken from the record.

covered, seen and unforseen with no rights of offset. What is TJ Maxx going to do in terms of offset if these obligations occur to the landlord? They're going to offset their rent. There's no provision for offsets.

(Testimony of Mr. David Bolger, Transcript at p. 199). Mr. Bolger's testimony is typical of the concerns raised by the landlords on both direct of the two witnesses called by the landlords and cross examination of the debtors' witnesses.

Also of utmost importance to the landlords was the debtors' request for attornment and non-disturbance agreements when there was no provision in the primary lease requiring such an agreement in the event of a sublease.[4] The debtors' couched their request in terms of a two-way offer of adequate protection pursuant to 11 U.S.C. § 363(b)[5] and § 363(e).[6] Upon cross examination, and through offers of Mr. Bolger and Mr. McCulla, the landlords urged that the primary leases do not require execution of NDA's.[7]

4. One of the primary leases, Store No. 157 in Savannah, Georgia, does contain a requirement that an NDA be provided. Section 21 of the lease provides:

 Landlord shall, within ten (10) days after Tenant's request, deliver to Tenant a non-disturbance agreement, reasonably acceptable to Tenant, executed and acknowledged by Landlord, for the benefit of any assignee of this Lease, or subtenant of all or any part of the Premises.

 Exhibit 11, Primary Lease, p. 54a–55. *See infra* page 771, footnote 20 for further discussion of this specific NDA requirement.

5. Section 363(b) provides in relevant part:

 (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

 11 U.S.C. § 363(b) (2000).

6. Section 363(e) provides as follows:

 (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or

The remainder of the landlords' objections related primarily to legal issues including whether 11 U.S.C. § 363 was the proper mechanism for the debtors' motion. Specifically, the landlords contend that assumption is required before the debtor can sublease the entire remainder of its lease in ½ of the available space. Although by no means exhaustive, this is a summary of the arguments made by the parties.[8]

## III. Discussion

The relief sought by the debtors is premised on section 363(b) of the Bankruptcy Code. The debtors seeks to "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b) (2000). Section 363(e) requires, that upon "request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold or leased, by the trustee, the court ... shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (2000).

 condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

 11 U.S.C. § 363(e) (2000).

7. Also an important part of the landlords' argument was that the court sanctioned NDA terms were in fact in the nature of injunctive relief requiring an adversary proceeding. Specifically, the landlords argued that an adversary proceeding is required because the debtors are seeking to determine the validity, priority or extent of an interest in property, seeking injunctive or equitable relief, seeking approval of the sale of an interest of a co-owner in property and requesting declaratory relief. The court took under advisement the procedural motion of the landlords to dismiss for failure to state a claim for which relief can be granted.

8. While not every argument of the parties is recited above, the court has fully considered all arguments raised by all parties.

## A. The Debtors Can Proceed Under 11 U.S.C. § 363 and Are Not Required to First Assume Under 11 U.S.C. § 365 [9]

■ The court finds that the debtors may sublet a portion of its space under section 363(b), but conditioned upon 363(e).[10] Section 363(e) requires that the court prohibit or condition the sale, use, or lease of property as is necessary to adequately protect the holder with the inter-

9. At least some of the landlords have argued that the debtors are attempting to evade the requirements of 11 U.S.C. § 365 by granting subleases that will exceed the rights of the primary leases. This argument, while perhaps compelling if an NDA were imposed by the court, is of no import without the NDA restrictions. The Sublease specifically provides that if the primary lease terminates, the sublease likewise terminates. If however, the debtors assume the primary leases, the landlord is in no worse position than it was before the motion was filed. During this "gap" period before assumption or rejection, the debtors must continue to meet all post-petition obligations. Therefore the court overrules the landlords' objection that the debtors must first comply with section 365 before subletting.

10. Each of the landlords also relies upon applicable state law in its respective state (New Jersey, Georgia, Michigan, Texas, Connecticut, New York, Kentucky, Louisiana and Florida). Under the law of some of these states, it is possible that the subletting of a portion of the debtor's space for the entire remainder of the term of the debtor's lease would be considered an assignment rather than a sublease. The debtors argue that a reversionary interest is retained by the right to receive rent and a substantial portion of the space. In the practical reality, the debtors are most likely correct because the specific terms of the subleases provide for the right to collect rent and the right to re-enter upon default, and a possible reversion of the interest conveyed when renewal options are not exercised. *See Smith v. Sun Oil Co., Inc.*, 165 La. 907, 116 So. 379, 381 (1928) (quoting several different treatises for the proposition that "[a]n assignment differs from a lease in that, by the latter, the lessor grants an interest less than his own, reserving to himself a reversion; but by assignment he parts with the whole of his interest in the estate."); *J.F. Auderer Lab. v. Deas*, 223 La. 923, 67 So.2d 179, 181–82 (1953) (holding that excess rent received by original tenant was enough of an interest to constitute a sublease); *Copland v. Parker*, 4 Mich. 660, 1857 WL 2217, *2 (1857) ("The distinction between assignment and underletting is broad an well defined. An assignment conveys the tenant's whole estate, which is his entire interest in all the premises.... [A] leasing by the tenant of part of the premises for the whole or part of the time, or the whole of the premises for part of the time is a mere sublet-

ting, and not an assignment.") *718 Associates, Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 361 (Tex.Ct.App.1999) ("As a general rule, if an instrument conveys the entire "term" of the lease without retaining any reversionary interest, the instrument will be construed an assignment.... If the assignor-lessee retains a right to reenter and repossess the property on default of rental payments, the assignor-lessee retains a contingent reversionary interest and the instrument will be construed as a sublease."); *see also* 49 AM. JUR. 2D *Landlord & Tenant* § 1077 (1995) ("There is however, authority for the principle that the intention of the parties governs in determining whether an instrument is an assignment or a sublease... [T]he duration of the primary term, as compared to the length of the sublease, is only a factor to be considered in determining the intention of the parties.").

But see, *Rocklen, Inc. v. Radulesco*, 10 Conn.App. 271, 522 A.2d 846, 848 (1987) ("The basic distinction between an assignment and a sublease is that by the former, the lessee conveys his whole interest in the unexpired term, leaving no reversion in himself; the latter transfers only a part of the leased premises for a period less than the original term.... [A] mere reservation of right of entry on default does not constitute retention of a reversionary interest."); *Co & Co Enterprises, Inc. v. Robertson*, 761 So.2d 1179 (Fla. Dist.Ct.App.2000) (slip copy) ("[A] transfer of the entire interest in the term of the lease without a reversion retained by the original lessee is an assignment rather than a sublease.... If a lessee transfers all his estate to another, the instrument of transfer operates as between the original lessor and the assignee of the term as an assignment and not as a sublease, and this is true even though the instrument is in the form a lease, uses words of demise, and reserves a new and different rent and the right to re-enter for non-payment of rent."); *Estate of Basile v. Famest, Inc.*, 718 So.2d 892, 892 (Fla.Dist.Ct.App.1998) (same); *Alford v. Jones*, 30 S.W. 1013, 1013 (Ky.Ct.App.1895) ("Where a lessee conveys his interest in part of the leased land for the whole term of his lease, the transaction is an assignment pro tanto of the lease, and not a sublease."); *Cities Serv. Oil Co. v. Taylor*, 242 Ky. 157, 45 S.W.2d 1039, 1040 (1932) (distinction depends on quantity of interest, not extent of the premises); *Georgia Power Co. v.*

est in such property.[11] The debtors' "offer" of adequate protection includes the incremental increase in value to the realty by the debtors' and TJX's capital improvements as well as a market lease that will in some instances pay 100% of the debtors' rent obligations for a lease occupying only 50% of the space in the event of termination or rejection of the primary lease, and the attornment and non-disturbance agreements.

### B. The Attornment and Non–Disturbance Provisions are in the Nature of Injunctive or Other Equitable Relief and the Debtors Have Not Shown Irreparable Harm Absent the Relief Requested

The issue of whether the landlords are adequately protected brings the landlord's motion to dismiss to the forefront. According to the landlords, the debtors are attempting to obtain injunctive relief by requiring the landlords to either sign NDA's or by having the court order that the landlords "shall not disturb or interfere with TJX's possession of the Demised Premises during the Term (including any Renewal Term) (as such terms are defined in the Lease/Sublease) so long as TJX is not in default under the terms and conditions of the Lease/Sublease and TJX agrees to attorn to [the landlords] and their successors and assigns should any interest of the Debtors with respect to the

W.J. Fletcher, 113 Ga.App. 559, 148 S.E.2d 915, 918 (1966) ("Subletting is a leasing by the lessee of a whole or part of the premises during a portion of the unexpired balance of his term."); Berkeley Development Co. v. Great Atlantic & Pacific Tea Co., 214 N.J.Super. 227, 518 A.2d 790, 795 (1986) ("Where the whole term of the lease is transferred by a lessee to a third party, the transfer is an assignment, not subletting... Retaining only a contingent right or possibility of possession such as the lessee's reservation of the power of reentry for non-payment of rent or default does not constitute a reversion."); McSpadden v. Dawson, 117 A.D.2d 453, 503 N.Y.S.2d 357, 362 (N.Y.1986) ("When a lessee has parted by sublease with his entire interest in the demised premise without any right or reversion an assignment of the lease is effected by operation of law. Thus, in those cases where the tenant has reserved some portion of the remaining term to himself he had been held to retain the right to repurchase. On the other hand, a subletting for the entire term of the lease without any express reservation of a reversionary interest is considered by operation of law, an assignment.").

The issue of whether the debtors have reserved a reversionary interest in each of the subleases is clouded by the existence of renewal options by both the debtors and TJX as subtenant. For example, the Savannah, Georgia primary lease is for a term of 30 years (beginning December 7, 1978) and contains the possibility of four renewal terms of five years each. Potentially, the debtors lease will extend until October 1, 2028. The sublease terminates on October 31, 2013 and may be extended at the option of TJX three times, in five year periods each, potentially extending the term until the debtors' primary

lease expires. However, if TJX does not exercise its option to extend, the primary landlord or the debtors are permitted to relet the premises. The only provision that relates to termination of the sublease simultaneously with the primary lease states as follows:

> In the event that this Lease terminates or otherwise expires on the same date of the termination or expiration of the Primary Lease, Tenant shall have the obligation to restore the Demised Premises to the condition as required by the Primary Lease.

(Section 17.2 of Savannah, Georgia, Store No. 157 Sublease).

The court must find in this case, that the interest conveyed by these debtors is in fact a sublease. It is impossible to state with certainty that either the debtors have or have not conveyed their interest in a part of the space for the balance of the lease term. Furthermore, the debtors retention of the right to collect rent, among other things, provides the debtors with an interest in the lease denying privity of contract between the primary landlord and the subtenant.

11. Interestingly, subsection (e) provides that the court provide adequate protection "on request of an entity that has an interest in the property used, sold or leased." Several of the landlords specifically argued that no request for adequate protection had been made. However, subsection (e) states that the court can order the adequate protection "with or without" a hearing, and furthermore, the court has construed the landlord's objection to the use, sale, or lease of properties in which they hold an interest as a request for adequate protection if the court is going to allow the use, sale or lease of the property.

TJX Store be transferred to [the landlords] or their successor of assigns by foreclosure or otherwise." (Exhibit A to the Debtors' Motion, Proposed Order, p. 5–6). The debtors contend that the attornment and NDA portions of the relief requested are necessary to ensure that the proposed capital improvements are made and that the subtenant's use and quiet enjoyment of the subleased premises will not be disturbed by the landlords as long as they continue to receive the benefit of the rental income associated with the sublease. The debtors argue that they are not seeking to invoke 11 U.S.C. § 105, but are instead relying on the court's discretion to approve a variety of different types of adequate protection.

The court agrees with the landlords that the relief sought is in the nature of a mandatory injunction requiring the filing of adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001[12].

The debtors' attempt to characterize the relief sought as an offer of adequate protection to the landlords places form over substance. Clearly, it is protection to the landlords for TJX to attorn to the NDA provisions; however, the landlords receive no protection from mandatory NDA terms. Ordering the landlords to refrain from disturbing or interfering with TJX's sublease as long as TJX is not in default does not provide protection to the landlords in the event that the primary lease somehow terminates.[13]

■ Despite the fact that an adversary proceeding is required for the injunctive relief sought by the debtors, courts in many instances have found that judicial economy permits the courts to look beyond Rule 7001 to the merits of the dispute provided no prejudice will result. *See In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 275–76 (E.D.Pa.1994); *In re Adams*, 106 B.R. 811, 833 (Bankr.D.N.J.1989); *In re Enfolinc, Inc.*, 233 B.R. 351, 353 (Bankr.

**12.** Federal Rule of Bankruptcy Procedure 7001 provides as follows:

An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:
(1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) of § 725 of the Code, Rule 2017, or Rule 6002;
(2) a proceeding to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d);
(3) a proceeding to obtain approval under § 363(h) for the sale of both the interest of the estate and of a co-owner in property;
(4) a proceeding to object to or revoke a discharge;
(5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan;
(6) a proceeding to determine the dischargeability of a debt;
(7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12 or chapter 13 plan provides for the relief;

(8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination;
(9) a proceeding to obtain a declaratory judgment relating to any of the foregoing; or
(10) a proceeding to determine a claim or cause of action removed under 28 U.S.C. § 1452.
FED.R.BANKR.P. 7001 (2000).

**13.** The debtors argue to the contrary. Were the debtors to reject or otherwise terminate the primary lease, the landlords will receive the benefit of ½ of the leased spaced already being rented to a strong tenant providing rent that is as much, and possibly more than, *100% of the rent paid by Service Merchandise* for ½ the space. In addition, taxes and CAM charges that would otherwise go 100% unpaid would be paid at least in part by TJX while the landlord marketed the remaining space for a new tenant at today's market rents. The court agrees that all of these benefits will inure to the landlords by this proposed deal. However, these benefits do not permit the court to impose a mandatory injunction for NDA provisions.

E.D.Va.1999) ("Although Bankruptcy Rule 7001 requires an adversary proceeding to be commenced in order to determine the validity, priority, or extent of a lien, there is authority which holds that failure to commence an adversary is not a jurisdictional defect and may be waived." These authorities have reasoned "where the rights of the parties have been adequately presented no prejudice results from consideration of the issues on the merits."); *In re Robinson*, 217 B.R. 527, 530 (Bankr. E.D.Tex.1998) (same).

▬ The landlords have argued that prejudice did result because they did not have ample time to prepare for the hearing. Despite this contention, the court heard no credible evidence of prejudice. The landlords complained that they were not served timely enough to respond to the motion. These arguments were not supported by the proof.[14] "Parties waive[ ] their right to protest the lack of an adversary proceeding when the court afforded them all the protections of an adversary proceeding yet they knowingly failed to litigate a Rule 7001 issue which they had an opportunity to litigate." *In re Zale*

*Corp.*, 62 F.3d 746, 763 (5th Cir.1995). In essence, the parties must be apprised of and have a chance to address·all the issues being decided. *Id.* (quoting *In re Haber Oil Co.*, 12 F.3d 426, 440 (5th Cir.1994)). Furthermore, unless the party is able to demonstrate prejudice by the failure to file an adversary proceeding, a court will find the error constitutes harmless error. *In re Cannonsburg Envtl. Assocs., Ltd.*, 72 F.3d 1260, 1264–65 (6th Cir.1996).[15] Accordingly, while the court finds that an adversary proceeding was required because the debtors' requested relief was in the nature of injunctive or equitable relief, the landlords did not demonstrate prejudice sufficient to require the filing of an adversary proceeding, and to dismiss on this basis places form over substance and would serve only to delay these proceedings.

▬ In order for the debtor to receive the NDA's by order of the court, the debtors would have to meet all of the necessary requirements for injunctive relief pursuant to Federal Rule of Bankruptcy Procedure 7065.[16] The Sixth Circuit has stated that an injunction may issue

14. For example, Chase Family L.P argues that the landlords had less than 20 days notice of the debtor's proposed action and the mortgagees have never received notice. According to Chase, the notice to the landlords was insufficient to conduct a similar analysis of that of the debtors of the proposed transaction. Yet Chase provided no evidence to support this contention. R–C Properties, II, ITR Property Company, and Melaver, Inc. argued that contested matters are generally designed for adjudication of simple issues, and that the instant is not a simple issue. These landlords rely on the testimony of Mr. Bolger who stated that proper evaluation of the proposed action would take more than the three weeks allotted in the present instance. While Mr. Bolger did state that he wanted additional time to evaluate the transaction, he did not testify how he had been prejudiced by the motion. Mr. Bolger testified only that he was opposed to the debtors' transaction under any circumstances because he did not believe he would receive any benefit from the transaction.

The court recognizes that allowing a contested matter instead of an adversary proceeding can constitute reversible error *IF* injunc-

tive relief is involved. *See In re Zale Corp.*, 62 F.3d 746 (5th Cir.1995) (Fifth Circuit reversed bankruptcy court treatment of contested matter as an adversary where injunctive relief was granted). However, there is no injunctive relief granted to the debtors in this instance and therefore, no prejudice to the landlords in waiving the adversary requirements.

15. Clearly, the landlords were not prejudiced in light of the court's ruling that denies any injunctive or other equitable relief that required the filing of an adversary proceeding.

16. Rule 7065 provides in relevant part:
 Rule 65 F. R. Civ. P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).
 **Injunctions**
 (a) Preliminary Injunction.
 (1) Notice. No preliminary injunction shall be issued without notice to the adverse party.
 (2) Consolidation of Hearing with Trial on Merits. Before or after the com-

only where the movant demonstrates the following:

1. Likelihood of success on the merits
2. Whether plaintiff will suffer irreparable injury without the injunction
3. Harm to others will occur if the injunction is not granted

4. Whether the injunction would serve the public interest

*American Imaging Services v. Eagle–Picher Industries, Inc.,* 963 F.2d 855 (6th Cir.1992). The debtors cannot get past the second prong of the injunction analysis. The court cannot find that the debt-

mencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

(b) Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order

shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

(c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof. The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

(d) Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

(e) Employer and Employee; Interpleader; Constitutional Cases. These rules do not modify any statute of the United States relating to temporary restraining orders and preliminary injunctions in actions affecting employer and employee; or the provisions of Title 28, U.S.C., § 2361, relating to preliminary injunctions in actions of interpleader or in the nature of interpleader; or Title 28, U.S.C., § 2284, relating to actions required by Act of Congress to be heard and determined by a district court of three judges.

FED.R.BANKR.P. 7065 (2000).

ors will be irreparably harmed unless this relief is granted.

First, the court heard no proof that TJX will walk away from the proposed transaction, which is admittedly an integral part of the debtors' reorganization efforts, without the imposition of NDA terms. Ms. Lofgren testified that it is standard practice for TJX to insist upon NDA's and that the terms of the sublease give TJX the option to exit the deal if NDA terms are not enforced, but she did not testify that TJX would indeed "walk away" if such were not agreed upon or otherwise ordered by the court. Secondly, and even more importantly, TJX is protected by the provision in the sublease that allows it to direct the debtor to assume the lease. The relevant provisions of the sublease provide as follows:

## ARTICLE 37

### NON–DISTURBANCE AGREEMENTS

37.1 *Non–Disturbance and Attornment Agreements*

. . .

(g) In the event (i) Landlord decides to reject the Primary Lease during the pendency of the Bankruptcy Case, (ii) Landlord has not delivered each of the DIP Lender NDA, the Landlord's Lender NDA, the NDA from Primary Landlord and the Primary Landlord's Lender NDA from Primary Landlord's Lender from each of the persons or entities as the case may be required by Sections 37.1(a), (b), (c) and (d) or there has been a failure of an NDA Order Condition pursuant to subsection (e) above and Tenant has provided Landlord with written notice of such failure, and (iii) this Lease has not previously terminated, Landlord shall either (x) provide ten (10) business days written notice to Tenant prior to filing a motion to reject the Primary Lease or (y) file a motion to reject the Primary Lease, which motion shall provide Tenant with the right to direct Landlord not to reject the Primary Lease within ten (10) days of Tenant's receipt from Landlord of a copy of and written notice of the filing of such motion, and in either case shall advise Tenant in writing of Landlord's good faith estimate based on Landlord's books and records of the amount of any cure claim under the Primary Lease. In the event that Tenant shall deliver to Landlord its written direction not to reject the Primary Lease, ("the *Direction Notice*") within such ten (10) day-period, Landlord shall use commercially reasonable efforts to seek to obtain an order of the Bankruptcy Court assuming the Primary Lease at the next scheduled omnibus hearing or any subsequent omnibus hearing, at the Landlord's sole option. In connection with the assumption of the Primary Lease, Landlord may at its sole option, may (i) retain its interest in the Primary Lease, (ii) assign its interest in the Primary Lease to Tenant with Tenant responsible for the payment of any ultimately allowed cure claim, or (iii) assign its interest in the Primary Lease together with Landlord's interest in this Lease to any other entity who has provided Tenant with adequate assurances of future performance required by Section 365(f) of the Bankruptcy Code. In the event Landlord receives from Tenant the Direction Notice during such ten (10) day period but the Primary Lease is rejected, Tenant shall be entitled to recover damages from Landlord (and from Service Merchandise Company, Inc. if Landlord is an affiliate of Service Merchandise Company, Inc.) in the amount of any damages sustained by Tenant as a consequence of such rejection, which, if Tenant is dispossessed, shall be in the amount of Tenant's Claim Amount (as that term is defined in subsection (f) above), which claim during the Case shall be entitled to allowance and prompt payment as an administrative claim with priority

under Section 507(a)(1) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, in the event Landlord does not receive from Tenant the Direction Notice within such ten (10) day-period, Tenant shall be deemed to have waived its right to direct Landlord not to reject the Primary Lease pursuant to this subsection (g), and Landlord shall have the right to obtain an order of the Bankruptcy Court rejecting the Primary Lease.

Sublease Section 37. Under this provision, TJX has the power to direct the debtors to assume the leases for TJX's protection. This right essentially ensures that if an NDA is not obtained, TJX will be protected by the debtors' assumption of the primary leases.

The debtors are not irreparably harmed by denial of their court sanctioned NDA terms. The proof at trial was that both TJX and the debtors intended to make substantial capital improvements at the various locations in anticipation of implementation of the debtors' reorganization strategies. The debtors have been given until March 31, 2001 to make a decision to assume or reject these leases. As argued by the landlords, it is difficult to imagine the debtors investing large amounts in capital improvements in each store location over the next year and a half only to reject these valuable "under-market" leases.

The court has given the debtor time to evaluate whether to assume or reject these leases, and this decision is consistent with the court's earlier ruling. The debtors are still given until March 31, 2001 to decide on assumption or rejection of those leases; however, the debtors must run the risk that TJX will force assumption of the Primary Leases if the debtors choose rejection after so much has been invested in capital improvements.

Third and finally, the court cannot find that the debtors will be irreparably harmed by denial of the NDA terms because the debtors are free to assume these leases at any time before the March 31, 2001 deadline. While it is the debtors' preference to delay curing of defaults in order to assume pursuant to 11 U.S.C. 365(b)(1)(A), the debtors have provided proof in this and other hearings that the debtors are enjoying substantial liquidity. Accordingly, while the debtors might prefer deferral of the payment of the cure amounts, the debtors are not irreparably harmed if they must assume these leases before the March 31, 2001 deadline in order to consummate the transaction with TJX.

## C. The Landlords Are Adequately Protected Under 11 U.S.C. § 363(e)

 Having found that the debtors should have filed an adversary proceeding to obtain their injunctive relief, but waiving that requirement to do so in light of the denial of the relief sought by the debtors, the case is now in the posture of whether the debtors are adequately protecting the landlords pursuant to 11 U.S.C. § 363(e). The debtors propose to adequately protect the landlords by the incremental value returned to the landlords' properties by the capital improvements made by the debtors and TJX and the benefits that the debtors argue would flow through to the Primary Lease. These benefits include, were the debtors to reject or otherwise terminate the primary lease, that the landlords will receive the benefit of ½ of the leased spaced already being rented to a strong tenant paying rent that is as much, and possibly more, than 100% of the rent paid by Service Merchandise for ½ the space. In addition, taxes and CAM charges that would otherwise go 100% unpaid would be paid at least in part by TJX while the landlord marketed the remaining space for a new tenant at today's market rents. Also of benefit to the landlord would be increased traffic if the store is in a shopping center, and if percentage rent is applicable, percentage rent would flow through to the Primary Lease.

By the court's ruling, the landlords will also have the benefit of negotiating NDA agreements with TJX on their own terms or for additional consideration. By essentially giving the debtors a date certain to make a decision on assumption or rejection of the leases, the landlords are in no worse of a position by allowing the debtors to sublease to TJX. The landlords' interests in their respective properties are being adequately protected by the benefits as listed above. They are not being subjected to court-ordered NDA terms, but are being given the additional benefits of the sublease.

While the court understood the concerns raised by Mr. Bolger and Mr. McCulla's testimony, the court found their testimony that they would receive no incremental benefits from the capital improvements unpersuasive. Should the debtors move to reject the leases or the primary leases otherwise terminate, the landlords are not under any court sanctioned NDA terms, and should the landlords choose to do so, they could receive the market rent of TJX as a tenant, and a portion of the taxes and CAM charges that would otherwise go unpaid in their entirety until a new tenant is located. If the leases are rejected and the landlords choose not to keep TJX as a tenant, then the landlord is free to market the entire box or the subdivided boxes to be renovated at the new tenant's expense.[17] The exposure to the landlords under this scenario is minimal.[18]

The court must exercise its discretion in fashioning what remedies adequately protect the landlords. Had the court required the debtors to assume these leases prior to the sublease agreements with TJX, the landlords would receive a reprieve of this court's earlier order giving the debtors until March 31, 2001 to render a decision on whether or not to assume or reject these leases. However, by denying the debtors request for mandatory NDA terms, the court has essentially forced the debtors hand. Either the debtors and TJX reach an agreement absent the NDA terms in which the renovations to the properties continue absent assumption, or the debtors will seek to assume the leases, or the debtors will seek to reject, in which case TJX could force assumption by the debtors. In either case, the debtors, TJX and the landlords are all on a level playing field.

### IV. Conclusions

For all of the reasons cited above, the court finds that the debtors should be allowed to proceed under 11 U.S.C. § 363(b) to consummate the subleases with TJX.[19]

**17.** In fact, the Subleases provide in Section 2.1 as follows:

*Leases Subject to Primary Lease.* Anything in any other article of this Lease to the contrary notwithstanding, it is expressly understood and agreed by and between Landlord and Tenant that this Lease is a sublease and is subject and subordinate to the Primary Lease; and that, while Landlord has covenanted hereunder not to default in its obligations under the Primary Lease, this Lease shall automatically terminate on the date of the expiration or termination of the Primary Lease, subject to the provisions of Article 37, and the parties hereto shall thereupon be relieved of all liability and obligation hereunder, excepting liabilities and obligations which accrued or arose prior to the date of such termination or expiration or relating to any breach hereof or default hereunder prior to said date.

Sublease, Article 2, Section 2.1.

**18.** The landlords have already been forced by this court's earlier order to await March 31, 2001 for the debtors' decisions on assumption or rejection. Allowing the debtors to sublease to TJX does not alter the landlord's position on that issue. All of the obligations of the debtors under the primary lease must be continued to be honored post-petition and all defaults must be cured upon assumption. Therefore, the landlords are receiving all of the same protections that existed prior to this motion, and the court finds that the additional benefits that flow from the subleases to the landlords adequate protection for the debtors' sublease prior to assumption of the leases.

**19.** *See In re Circle K Corp.,* 127 F.3d 904, 910 (9th Cir.1997) ("The bankruptcy court was not compelled to require a course of action that would render its extension of time illusory, thus depriving the Debtors of the opportunity to reorganize without pre-

The court finds that the landlords are adequately protected by the benefits of the subleases and the capital improvements proposed by the debtors and TJX, and furthermore by the landlords' rights in the event of termination of the primary lease absent any NDA terms imposed by the court. Accordingly, the court will grant the relief sought by the debtor to sublease to TJX at the eleven stores as listed above, specifically subject to the terms set forth herein.[20]

The court will direct counsel for the debtors to prepare orders consistent with the court's ruling. The debtors may generate separate orders for each landlord or may prepare an omnibus order relating to all landlords covered by this court's ruling. The Order shall be submitted within ten days of entry of this Memorandum.

It is, THEREFORE, so ordered.

maturely burdening the estate with unexpired lease obligations."). The same is true in this case. This court's decision to extend pursuant to section 365(d)(4) and likewise to extend the debtors exclusivity periods was purposefully meant to give the debtors additional time to assume or reject. Today's decision is consistent with this reasoning.

**20.** Store No. 157 in Savannah, Georgia did contain a provision in the lease requiring the landlord to execute an NDA. The court's ruling today does not negate or otherwise affect this provision.

Store No. 820 also specifically objected that TJX as a subtenant would violate the use restrictions contained in the primary lease. The court found Ms. Lofgren's testimony credible that the restrictive covenants of the primary lease would not be violated. Furthermore, the subleases are expressly conditioned upon compliance with the primary lease. Therefore, any definition of "use" that was inconsistent with or broader than the primary lease would necessarily be limited by the primary lease. Section 2.2 of the sublease provides:

> *Compliance with Primary Lease.* Tenant represents and warrants that Tenant, its agents, contractors, sublessees licensees or concessionaires will not violate or breach any of the terms, covenants or conditions of the Primary Lease and that Tenant, its agents, contractors, sublessees, licensees or concessionaires will not do anything which would violate, or breach the Primary Lease or cause the Primary Lease to be terminated or forfeited.

Sublease, Article 2, Section 2.2. Accordingly, the court overrule this specific objection relating to Store No. 820.